UNITED STATES DISTRICT COURT WESTERN
DISTRICT OF LOUISIANA LAFAYETTE DIVISION

| | | |
|---|---|---|
| MICHAEL D. CLAY, LARRE G. | § | |
| BUTLER and CLAYTON SHAMSIE | § | |
| individually and on behalf of all | § | Docket No. 6:16-cv-0296-UDJ-CBW |
| others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | DISTRICT JUDGE DEGRAVELLES |
| | § | MAGISTRATE JUDGE WHITEHURST |
| vs. | § | |
| | § | |
| NEW TECH GLOBAL | § | |
| VENTURES, LLC, | § | COLLECTIVE ACTION |
| | § | PURSUANT TO 29 U.S.C. § 216(b) |
| Defendant. | § | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR
DECERTIFICATION AND TO SEVER NAMED PLAINTIFFS' CLAIMS**

Respectfully submitted,

CHAMBERLAIN HRDLICKA WHITE
WILLIAMS & AUGHTRY

/s/ Annette A. Idalski
Annette A. Idalski
Pro Hac Vice
Peter N. Hall
Pro Hac Vice
191 Peachtree Street, NE, 46th Floor
Atlanta, Georgia 30303-1747
Telephone: (404) 658-5386
annette.idalski@chamberlainlaw.com
peter.hall@chamberlainlaw.com
Attorneys for Defendant, New Tech
Global Ventures, LLC

GORDON, ARATA, MONTGOMERY BARNETT,
MCCOLLAM, DUPLAINTS & EAGAN, LLC

/s/ Donna Phillips Currault
Donna Phillips Currault
# 19533
Ryan McAlister
# 37788
201 Saint Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone: (504) 569-1862
dcurrault@gamblaw.com
rmcalister@gamblaw.com
Attorneys for Defendant, New Tech Global
Ventures, LLC

## TABLE OF CONTENTS

FACTUAL BACKGROUND ...................................................................................................................1

I.      NEW TECH GLOBAL VENTURES AND RIG CLERKS.......................................................1

II.     PLAINTIFFS ARE IN BUSINESS FOR THEMSELVES ........................................................2

        A.      PLAINTIFFS' DECISIONS ON HOW TO STRUCTURE THEIR BUSINESSES WERE
                VASTLY DIFFERENT...............................................................................................2

        B.      PLAINTIFFS MADE DIFFERENT DECISIONS ABOUT WHAT WORK TO PURSUE
                BASED ON THEIR SKILLS AND EXPERIENCE ......................................................3

        C.      PLAINTIFFS MADE DIFFERENT DECISIONS ABOUT INVESTMENTS IN THEIR
                BUSINESSES WHICH AFFECTED THEIR PROFITS.............................................7

LEGAL STANDARD FOR CERTIFICATION OF COLLECTIVE ACTIONS .......................................9

ARGUMENT ......................................................................................................................................10

I.      THERE IS NO FIFTH CIRCUIT CASE SUPPORTING CERTIFICATION OF AN INDEPENDENT
        CONTRACTOR COLLECTIVE ACTION AND THEY ARE ROUTINELY DECERTIFIED BY
        OTHER COURTS. ...........................................................................................................10

II.     THE FIVE-FACTOR INDEPENDENT CONTRACTOR TEST WILL REQUIRE INDIVIDUALIZED
        EVIDENCE......................................................................................................................14

        A.      THERE IS NO COMMON PROOF OF CONTROL OVER EACH PLAINTIFF........................15

        B.      THERE IS NO COMMON PROOF OF EACH PLAINTIFF'S OPPORTUNITIES FOR
                PROFIT OR LOSS...................................................................................................16

        C.      THERE IS NO COMMON PROOF OF EACH PLAINTIFF'S INVESTMENTS IN THEIR
                BUSINESSES...........................................................................................................17

        D.      THERE IS NO COMMON PROOF OF EACH PLAINTIFF'S SKILLS/INITIATIVE. ...............19

        E.      THERE IS NO COMMON PROOF OF EACH PLAINTIFF'S PERMANENCY........................20

III.    NEW TECH'S INDIVIDUALIZED DEFENSES WEIGH IN FAVOR OF DECERTIFICATION ..............20

IV.     FAIRNESS AND JUDICIAL EFFICIENCY WEIGH IN FAVOR OF DECERTIFICATION. ..................22

        A.      THE SMALL SIZE OF THIS COLLECTIVE, STANDING ALONE, WEIGHS IN FAVOR
                OF DECERTIFICATION..........................................................................................22

        B.      PRESERVATION OF NEW TECH'S DUE PROCESS RIGHTS FAVORS
                DECERTIFICATION. .............................................................................................23

      C.      PLAINTIFFS WILL NOT BE UNDULY PREJUDICED BY DECERTIFICATION....................23

V.      NAMED PLAINTIFFS′ CLAIMS SHOULD BE SEVERED....................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Allsup's Convenience Stores, Inc.*,
600 F.3d 516 (5th Cir. 2010) .................................................................................25

*Adami v. Cardo Windows, Inc.*,
No. 12-2804, 2016 WL 1241798 (D.N.J. Mar. 30, 2016) ................................ 14, 23

*Anderson v. Cagle's, Inc.*,
488 F.3d 945 (11th Cir. 2007) ............................................................................... 10

*Bamgbose v. Delta-T Group, Inc.*,
684 F. Supp. 2d 660 (E.D. Pa. 2010) .................................................................... 11

*Blair v. TransAm Trucking, Inc.*,
309 F. Supp. 3d 977 (D. Kan. 2018) ................................................................*passim*

*Burch v. Qwest Communications Int'l, Inc.*,
677 F. Supp. 2d 1101 (D. Minn. 2009) ................................................................. 20

*Carrera v. UPS Supply Chain Solutions, Inc.*,
No. 10-60263, 2012 WL 12860750 (S.D. Fla. 2012) ............................................ 14

*Dang v. Inspection Depot, Inc.*,
No. 14-61857, 2015 WL 11598702 (S.D. Fla. Nov. 6, 2015) ............................... 14

*Demauro v. Limo, Inc.*,
No. 8:10-cv-413-T-33AEP, 2011 WL 9191 (M.D. Fla. Jan. 3, 2011) .................. 11

*Eberline v. Media Net, L.L.C.*,
636 F. App'x 225 (5th Cir. 2016)........................................................................... 19

*Gallender v. Empire Fire & Marine Ins. Co.*,
No. 05-220, 2007 WL 325792 (S.D. Miss. Jan. 31, 2007)..................................... 10

*Gate Guard Services, LP v. Perez*,
792 F.3d 554 (5th Cir. 2015)............................................................................ 20, 22

*Green v. Harbor Freight Tools USA, Inc.*,
888 F. Supp. 2d 1088 (D. Kan. 2012) .................................................................... 24

*Griffith v. Fordham Fin. Mgmt., Inc.*,
No. 12-cv-1117, 2016 WL 354985 (S.D.N.Y. Jan. 28, 2016) .......................... 14, 22

*Harris v. Express Courier Int'l, Inc.*,
No. 5:16-cv-05033, 2017 WL 5606751 (W.D. Ark. Nov. 21, 2017)............... 13, 14, 16

*Harrison v. Delguerico's Wrecking & Salvage, Inc.*,
    No. 13-5353, 2016 WL 826824 (E.D. Pa. March 2, 2016) ..................................................10, 21

*Hartley v. Clark*,
    No. 3:09-cv-559, 2010 WL 1187880 (N.D. Fla. Feb. 12, 2010)...................................................25

*Hernandez v. Fresh Diet, Inc.*,
    No. 12-cv-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014)..........................................*passim*

*Hughes v. Burie*,
    No. 3:12-cv-332, 2014 WL 1572543 (N.D. Fla. Apr. 18, 2014) .................................................12

*Keef v. M.A. Mortenson Co.*,
    No. 07-cv-3915(JMR), 2009 WL 465030 (D. Minn. Feb. 24, 2009)...........................................23

*Lasseter v. Restaurant Delivery Developers, LLC*,
    No. 8:18-cv-1912-T-33TGW, 2018 WL 4091987 (M.D. Fla. Aug. 28, 2018) .....................14, 25

*Mooney v. Aramco Services Co.*,
    54 F.3d 1207 (5th Cir. 1995) .......................................................................................................11

*Peña v. Handy Wash, Inc.*,
    No. 14-20352, 2015 WL 11713032 (S.D. Fla. May 22, 2015) .............................................14, 18

*Portillo v. Permanent Workers, LLC*,
    662 F. App'x 277 (5th Cir. 2016)............................................................................1, 9, 10, 24

*Randolph v. PowerComm Const., Inc.*,
    309 F.R.D. 349 (D. Md. 2015) ....................................................................................................12

*Roberson v. Restaurant Delivery Developers, LLC*,
    --- F. Supp. 3d ----, 2018 WL 3056183 (M.D. Fla. Jun. 20, 2018) .................................14, 21, 23

*Rodriguez v. Niagara Cleaning Servs., Inc.*,
    No. 09-22645, 2010 WL 11505505 (S.D. Fla. Dec. 14, 2010) ...........................................10, 24

*Sandoz v. Cingular Wireless LLC*,
    553 F.3d 913 (5th Cir. 2008).........................................................................................................9

*Scott v. Chipotle Mexican Grill, Inc.*,
    2017 WL 1287512 (S.D.N.Y. 2017) ...........................................................................................23

*Senne v. Kansas City Royals Baseball Corp.*,
    315 F.R.D. 523 (N.D. Cal. 2016) ................................................................................................21

*Shayler v. Midtown Investigations, Ltd.*,
    No. 12 cv 4685, 2013 WL 772818 (S.D.N.Y. Feb. 27, 2013) .....................................................14

*Smith v. Frac Tech Servs., LLC*,
    No. 4:09-cv-000679, 2011 WL 96868 (E.D. Ark. Jan. 11, 2011)...............................................24

*Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*,
    553 F.3d 559 (7th Cir. 2009) ........................................................................... 15

*Thibault v. Bellsouth Telecommun's, Inc.*,
    612 F.3d 843 (5th Cir. 2010) ........................................................... 15, 16, 18, 20

*Usery v. Pilgrim Equip. Co.*,
    527 F.2d 1308 (5th Cir. 1976) ........................................................................ 19

*Vanzzini v. Action Meat Distributors, Inc.*,
    995 F. Supp. 2d 703 (S.D. Tex. 2014) ......................................................... 10, 23

*Verma v. 3001 Castor, Inc.*,
    No. 13-3034, 2016 WL 6962522 (E.D. Pa. Nov. 29, 2016) ...................................... 12

*White v. 14051 Manchester, Inc.*,
    301 F.R.D. 368 (E.D. Mo. 2014) ...................................................................... 22

*Wiatrek v. Flowers Foods, Inc.*,
    No. SA-17-CA-772-XR, 2018 WL 3040583 (W.D. Tex. June 16, 2018) .................... 11, 22

**Statutes**

29 U.S.C. § 216(b) ........................................................................................ 10, 11, 22

FLSA ................................................................................................................ *passim*

**Other Authorities**

29 C.F.R. Part 785, Subpart C ........................................................................... 21

29 C.F.R. § 541.200 ......................................................................................... 21

29 C.F.R. § 541.601 ......................................................................................... 21

Fed. R. Civ. P. 20 ....................................................................................... 24, 25

Fed. R. Civ. P. 21 ........................................................................................... 25

This Motion invokes the second, more stringent stage applicable to an FLSA collective action –

decertification.[1] Given the lenient first-stage standard, on September 23, 2016, the parties stipulated to

conditional certification and agreed to limit circulation of the notice to "[a]ll current and former workers of

Defendant retained as 'rig clerks'" during the maximum limitations period. [D.E. 17]. Although it stipulated to

conditional certification, New Tech did not concede that Plaintiffs were "similarly situated" or that the case

should proceed collectively. (*Id.* ¶ 7). Rather, New Tech specifically "reserve[d] its right to argue that Plaintiffs

and those individuals who may opt-in to this action are not 'similarly situated,' and retain[ed] its right to seek

decertification of the conditionally certified class at a later time." (*Id.*) That time has come.

Discovery has made clear that the Plaintiffs and opt-ins are not similarly situated. While Plaintiffs all

worked for New Tech's clients pursuant to independent contractor agreements, they are different in every

material way. As courts in the Fifth Circuit recognize, the fact-specific economic realities test that must be

applied to Plaintiffs' claims is simply not susceptible to collective treatment. As a result, if this Motion for

Decertification is not granted, this case will devolve into a series of unmanageable mini-trials, with no

efficiencies to be gained and with New Tech's due process right to defend against each Plaintiff's claim

compromised. The Court should not be the first in this Circuit to permit this unjust outcome. Instead, it should

decertify this case and allow each Plaintiff to bring his own claims in a separate action.

FACTUAL BACKGROUND

I.    New Tech Global Ventures and Rig Clerks

New Tech has been a leader in project management and consultancy services in the oil and gas

industry for nearly two decades. (10/9/18 Decl. of Larry Cress, Ex. A at ¶ 3). Following the rise of small,

independent oil companies in the mid-1980s, there was an increased need for expert workers to help the

---

[1]    *Portillo v. Permanent Workers, LLC,* 662 F. App'x 277, 280 (5th Cir. 2016) (at decertification stage, "courts are much less
likely to allow the collective action to continue to trial.").

independent oil and gas operators effectively and efficiently compete with large oil companies in various oil plays. (Cress Decl. at ¶ 4). Given their size, however, smaller operators could not maintain a roster of employees with expertise in all the numerous different drilling contexts in which the operators were competing. (*Id.* at ¶ 5). New Tech was formed to help smaller operators obtain this expertise by maintaining a list of contractors and which operators could tap into on a project-to-project, as-needed basis. (*Id.* at ¶ 6).

As relevant to this action, one group of independent contractors with whom New Tech maintains relationships is rig clerks. (*Id.* at ¶ 10). At a high level, rig clerks are experts in logistics and cost tracking for drilling rigs. (*Id.* at ¶ 9). Depending on the particular project, a rig clerk might: ensure that offshore drilling rigs are fully staffed and equipped to avoid delays and cost overruns; monitor and track daily costs to ensure profitability; safely and efficiently coordinate onshore suppliers and transport; administer customs and cross-border logistics; create manifests for supply boats/helicopters; and/or prepare reports for various stakeholders. (*Id.*). Whatever the challenges of a particular job, however, New Tech has no role in day-to-day job duties or assignments for rig clerks. (*Id.*).

II.   <u>Plaintiffs are in business for themselves</u>

As would be expected of independent contractors in business for themselves, each Plaintiff had full control over every decision related to his business. This individualized control manifested itself in different decisions by each Plaintiff regarding how to structure his own business, what lines of business to pursue, how to find work, and how much to invest. These differences are material to the Fifth Circuit's economic realities test, and make it impossible to apply that test on a class-wide basis, thus requiring decertification.

A.   **Plaintiffs' decisions on how to structure their businesses were vastly different**

With regard to how to structure their businesses, Plaintiffs made entirely different decisions. For example, Clay and Butler formed S-corporations (Michael Clay Enterprises, Inc. and LGB, Inc.), while Shamsie

and Harvey formed limited liability companies (Clayton Paul Shamsie, LLC and JRH Consulting LLC).[2] Shamsie, however, petitioned the IRS to treat his LLC as an S-corporation for tax purposes. (Ex. D). Four other plaintiffs (Anderson, Deckhard, Holbrook, and Warren), though, chose to operate as individuals, without the tax or risk-mitigation benefits of a separate legal entity.[3]

Within their chosen corporate forms, Plaintiffs made different decisions on ownership – Michael Clay Enterprises, Inc. was owned equally by Clay and his wife, as was Butler's company, LGB, Inc.[4] Clayton Paul Shamsie, LLC, by contrast, was 100% owned by Shamsie himself, although he was married.[5] The Plaintiffs also made different decisions regarding how to pay themselves and their employees. For example, in 2015, Butler's company, LGB, Inc. paid 47% of its revenues in officer compensation and wages to Butler and his wife, while Michael Clay Enterprises, Inc. paid just 34% of its revenues in officer compensation, with all of it devoted to Clay, and none to his wife.[6] In 2014, Clayton Paul Shamsie, LLC gave 20% raises to Shamsie and his wife, while in the same year, LGB, Inc. did not increase compensation for either Butler or his wife.[7] Butler's and Shamsie's decisions to pay themselves and their wives through their businesses required them to pay employment taxes and issue IRS Form W-2s, while Clay's decision to only pay himself as an officer meant he paid no employment taxes and issued no Form W-2.[8]

B.     Plaintiffs made different decisions about what work to pursue based on their skills and experience

Plaintiffs have widely divergent backgrounds and skill sets, which dictated their work.[9] For example,

---

[2]     Michael Clay Enterprises, Inc. Tax Returns, Ex. B; LCB Inc. Tax Returns, Ex. C; Clayton Paul Shamsie LLC Tax Returns, Ex. D; JRH LLC Tax Returns, Ex. E.
[3]     Dep. of Joseph Anderson, Ex. F at 44:16-17; Dep. of Joshua Warren, Ex. G at 39:24-40:18; Dep. of Gene Holbrook, Ex. H at 66:6-12; Albert Deckhard 1099's, Ex. I.
[4]     Schedule K-1, Ex. B; Schedule K-1, Ex. C.
[5]     Schedule K-1, Ex. D.
[6]     2015 Form 1120S, Ex. C; 2015 Form 1120S, Ex. B.
[7]     2013 and 2014 Form 1120S, Ex. D; 2013 and 2014 Form 1120S, Ex. C.
[8]     Form W-2, Ex. C; Form W-2, Ex. D.
[9]     In addition to their experience, Plaintiffs developed their respective skill sets in various ways, such as on-the-job training, or personally investing in a training course. For example, Anderson testified that he was trained on software he used by New Tech's customer, Eni. Anderson Dep., Ex. F at 39:13-40:17. Clay paid for his own safety training, but negotiated a reimbursement directly from Eni. Clay Dep., Ex. J at 32:5-34:6. Clay, however, learned how to be a Rig Clerk from on-the-job training delivered by Butler. *Id.*

Anderson had nine years of experience as a rig clerk before contracting through NTG.[10] Butler had two to three years of experience as a rig clerk before affiliating with New Tech.[11] On the other hand, Clay had some experience in the oilfield, but had never been a rig clerk before affiliating with New Tech in 2005.[12] And Harvey had never even worked in the oilfield before becoming a rig clerk through New Tech.[13]

Against this varying backdrop of experience, Plaintiffs made different decisions regarding what lines of business to pursue. Michael Clay Enterprises, Inc. diversified beyond oilfield consulting services into commercial crawfish and rice farming operations.[14] As a result, Clay was forced to divide his business time and attention between his oilfield work and his crawfish and rice farming operations.[15] Butler's company, LGB, Inc., also maintained a charter fishing business, in addition to its work in the oilfield, which similarly required Butler to divide his time and attention.[16] By contrast, Clayton Paul Shamsie, LLC and Anderson (as a sole proprietorship) focused exclusively on their oilfield services line of business and did not pursue other revenue-generating opportunities.[17]

Even within the oilfield parts of their business, Plaintiffs made different decisions about how to find revenue-generating opportunities. For example, Shamsie, Anderson, and Harvey testified that they found all of their own work through their relationships with oil companies, and simply ran the jobs through New Tech to take advantage of New Tech's group commercial liability insurance.[18] By contrast, Clay periodically called New Tech looking for other opportunities when work was slow.[19]

---

at 57:9-58:1. Warren attended new employee orientation from New Tech's customer BHP. Warren Dep. Ex., G at 18:25-20:12. Unlike these plaintiffs, though, Butler and Shamsie paid for their own training. Butler Dep., Ex. K at 33:16-36:1; Shamsie Dep., Ex. L at 25:22-27:1. And Harvey testified that he did not have any certifications or safety training at all. Harvey Dep., Ex. M at 19:22-20:13, 49:18-21.

| | |
|---|---|
| 10 | Anderson Dep., Ex. F at 10:11-13:10. |
| 11 | Butler Dep., Ex. K, at 27:23-31:14. |
| 12 | Clay Dep., Ex. J at 35:5-38:7. |
| 13 | Harvey Dep., Ex. M, at 13:13-20. |
| 14 | Clay Dep., Ex. J at 28:13-29:12, 105:19-106:8. |
| 15 | *Id.* |
| 16 | Butler Dep., Ex. K at 87:23-88:17. |
| 17 | *See* Ex. D.; Anderson Dep., Ex. F at 44:16-17. |
| 18 | Shamsie Dep., Ex. L at 121:10-16; Anderson Dep., Ex. F at 18:8-11; Harvey Dep., Ex. M at 24:11-21. |
| 19 | Clay Dep., Ex. J at 120:8-16. |

Each Plaintiff had full control over how many and which projects to work. Harvey and Warren, for example, testified that they never turned down a project from New Tech.[20] Butler, by contrast, admitted that he could turn down jobs without negative consequences from New Tech and, if necessary, find a replacement to work for him.[21] Clay also admitted he could turn down work without negative repercussions, and even walked off a rig after he had accepted the job because he didn't like the accommodations.[22] Clay had developed such a solid personal reputation with the operator, however, that he was able to secure an alternative job directly from the operator; New Tech did not "place" or "assign" Clay on any alternative job.[23]

As a corollary to their individualized control over finding their own work and whether to accept or reject any particular job, Plaintiffs also each had control over their fees. Clay and Warren testified that they accepted whatever fee was offered, but when Butler heard that other companies were paying rig clerks more than he was making, he called the operator and negotiated a raise for himself.[24]

This individualized control over where to find work and which projects to work resulted in Plaintiffs developing relationships and working for different operators: Warren worked exclusively for BHP; Clay worked for Eni, Ameritech, and Tanner Exploration; and Butler, Shamsie, Harvey, and Anderson worked exclusively for Eni.[25] It also resulted in Plaintiffs working on different kinds of projects: Clay worked on both onshore and off-shore projects, where job responsibilities differed.[26] Harvey worked exclusively off shore, and Warren worked exclusively onshore.[27] Clay accepted some projects that involved customs and cross-border issues, while Warren never worked a job that involved those challenges.[28]

Given the variations in the types of projects Plaintiffs accepted, their day-to-day activities varied

---

[20]   Harvey Dep., Ex. M at 48:3-5; Shamsie Dep., Ex. L at 79:21-23.
[21]   Butler Dep., Ex. K at 85:18-25.
[22]   Clay Dep., Ex. J at 52:24-55:15.
[23]   Clay Dep., Ex. J at 52:24-55:15.
[24]   *Id.* at 52:8-14; Warren Dep., Ex. G at 79:13-20; Butler Dep., Ex. K at 84:18-85:17.
[25]   Butler Dep., Ex. G at 91:1-3; Clay Dep., Ex. J at 103:17-105:8; Shamsie Dep., Ex. L at 15:3-4; Harvey Dep., Ex. M at 59:8-12; Anderson Dep., Ex. F at 18:8-11.
[26]   Clay Dep., Ex. J at 17:19-18:18, 97:7-98:10.
[27]   Harvey Dep., Ex. M at 11:18-24; Warren Dep., Ex. G at 104:9-20.
[28]   *Id.*; Clay Dep., Ex. J at 119:13-120:7.

depending on the project and operator. As Shamsie testified, different customers have different expectations for rig clerks.[29] Depending on the project, Plaintiffs dealt with different individuals, although none worked for New Tech. When Clay worked on offshore rigs, he reported directly to the company man, but when he worked on-shore, he reported to a logistics coordinator.[30] Warren, by contrast, worked exclusively on projects for BHP, where he reported to a "rig clerk supervisor" (not an NTG employee).[31]

Plaintiffs' testimony also shows a great degree of freedom over their day-to-day schedules. For example, Clay had no set daily schedule, and sometimes used time while he was on the rig to manage his crawfish and rice farming operations.[32] Clay also testified to the availability of leisure activities, such as watching movies, lifting weights, or fishing on some rigs, although he chose not to pursue those activities during his free time.[33] Warren had free time when he was not working, but did not pursue other business ventures during that time.[34] Butler testified that he could take breaks whenever he wanted.[35] Anderson, by contrast, testified that when he was not busy, he would play video poker or watch TV.[36]

Plaintiffs' individualized freedom over their work resulted in vastly different schedules, with different numbers of hours worked. For example, Clay worked from 4:00 a.m. until 7:00 p.m. (15 hours); Shamsie testified that he worked from 3:45 a.m. to 8:00 p.m. (16.25 hours); Warren testified that he worked from 5:00 a.m. to 5:00 p.m. (12 hours), and Harvey sometimes worked from 4:30 a.m. to 6:00 p.m. (13.5 hours), and sometimes worked a night shift from 5:00 p.m. to 8:00 a.m. (15 hours).[37] Anderson, for his part, testified that he typically worked a total of 15.5 hours, sometime between 3:30 a.m. and 10:00 p.m.[38] Last, this

---

29    Shamsie Dep., Ex. L at 12:20-14:15, 22:20-23:13.
30    Clay Dep., Ex. J at 24:13-25:20.
31    Warren Dep., Ex. G at 58:22-60:16.
32    Clay Dep., Ex. J at 28:13-29:12, 74:16-75:6.
33    Id. at 89:9-92:1.
34    Warren Dep., Ex. G at 71:20-73:10.
35    Butler Dep., Ex. K at 79:18-80:5.
36    Anderson Dep, Ex. F at 32:1-2.
37    Clay Dep., Ex. J at 16:19-17:14; Shamsie Dep., Ex. L at 12:20-14:3; Warren Dep., Ex. G at 55:2-11; Harvey Dep., Ex. M at 29:16-31:19.
38    Anderson Dep., Ex. F at 31:1-32:14, 43:10-20.

individualized control over finding their own projects and which projects to work also led to significant differences in the time between the first and last projects Plaintiffs worked through New Tech: Butler (15 years), Clay (10 years), Baker (2 months), Warren (6 months), Shamsie (2.5 years), Harvey (18 months), Anderson (6 years), Deckhard (9 months), Holbrook (7.5 years).[39]

In sum, there are so many differences between Plaintiffs' businesses that this case cannot possibly tried collectively. This is because Plaintiffs each had <u>total control</u> regarding where to find work (through their own relationships with operators or through New Tech), whether to accept or reject a particular project (which resulted in Plaintiffs working for different operators, on different kinds of projects, for different lengths of time), and how much they would charge.

C.     **Plaintiffs made different decisions about investments in their businesses which affected their profits**

Plaintiffs' individualized control over their respective businesses led to differences in the success of their businesses. From 2012 to 2015, Butler, Clay, and Shamsie were very successful, generating $631,448.31, $579,435.82, and $569,992.75 in revenues, respectively.[40] By contrast, during the same period, Deckhard and Baker were much less successful, generating just $29,600 and $10,200, respectively.[41] Five of the nine Plaintiffs generated average annual revenues between $109,000 (Anderson) and $158,000 (Butler), while the remaining four were between $10,000 (Baker) and $48,300 (Holbrook).[42]

Plaintiffs controlled their own profits (or losses) based on their individual decisions about how to invest in their businesses.[43] As business owners, every year, each Plaintiff decided how much to invest, given his

---

[39]     Butler Dep., Ex. K at 50:5-57:24; Clay Dep., Ex. J at 15:13-16:3; Baker Personnel File, Ex. N; Warren Dep., Ex. G at 28:2-7; Shamsie Dep., Ex. L at 12:9-12; Harvey Dep., Ex. M at 11:14-22; Anderson Dep., Ex. F at 12:15-18:11; Ex. I; Holbrook Dep., Ex. H at 76:12-18, 78:4-6.

[40]     *See* Ex.'s C, B, D.

[41]     *See* Ex.'s I, N.

[42]     *See* Ex.'s O, C, N, Q; Holbrook 1099's Ex. P.

[43]     Regardless of whether they provided rig clerk services through a separate legal entity, each Plaintiff paid taxes as an independent contractor, writing off all the expenses incurred in the operation of their businesses. (*See* Ex.'s B, C, D, E, O, Q). It is therefore the tax returns that provide insight into Plaintiffs' respective investments. However, Deckhard and Baker have refused to produce their tax returns. (*See* D.E. 68). A Motion to Dismiss them from this lawsuit is pending and should be granted given the prejudice their lack of participation has caused at the dispositive motion stage of this litigation. (*Id.*).

expected revenue and desired profit margin. As evidenced by the 2013 through 2015 tax returns filed by their various different business entities, Clay's investments ranged from $77,079 in 2015 to $161,592 in 2014; Butler ranged from $54,767 in 2015 to $117,288 in 2013; and Shamsie ranged from $76,166 in 2015 to $146,620 in 2014.[44] By contrast, Anderson's 2013 and 2014 tax returns show that he invested a two year total of just $15,313.[45] As a result, Clay's, Butler's, and Shamsie's businesses showed profit margins between 18% and 51%, while Anderson's business posted a whopping 93% profit margin.[46]

As an example of the vast differences in investments amongst the Plaintiffs' businesses, Michael Clay Enterprises, Inc. had nearly $200,000 invested in buildings and other depreciable assets, while Clayton Paul Shamsie, LLC and LGB, Inc. (Butler) respectively invested just $73,406 and $57,910 in the same category.[47] Similarly, Plaintiffs differed as to where they obtained personal protective equipment (PPE) and supplies. Clay's PPE came from either himself or the operator (not New Tech).[48] Warren, Harvey, and Anderson also testified that they did not get any PPE from New Tech.[49] Butler and Shamsie, however, testified that they received New Tech fire-retardant shirts and hard hats.[50] In addition to PPE, Clay sometimes used his own computer and charged a fee for the use of his computer.[51] And Anderson testified that he bought some office supplies and wrote off the expenses on his taxes.[52]

In addition to the variations in the amounts invested, Plaintiffs each made their own decisions about what *kinds* of investments to make in their businesses. For example, Michael Clay Enterprises, Inc. invested in a retirement plan for its employees, which no other Plaintiff did.[53] As another example, Clayton Paul Shamsie,

---

[44]   2014 and 2015 Form 1120 S, Ex. B; 2013 and 2015 Form 1120S, Ex. C; 2014 and 2015 Form 1120S, Ex. D.
[45]   *See* Anderson Tax Returns, Ex. O.
[46]   *Id.*; 2014 and 2015 Form 1120 S, Ex. B; 2013 and 2015 Form 1120S, Ex. C; 2014 and 2015 Form 1120S, Ex. D.
[47]   2016 Form 1120S Schedule L, Ex. B; 2013 Form 1120S Schedule L, Ex. D; 2013 Form 1120S Schedule L, Ex. C.
[48]   Clay Dep., Ex. J at 79:20-80:15.
[49]   Warren Dep., Ex. G at 50:14-51:19; Harvey Dep., Ex. M at 36:24-38:17; Anderson Dep., Ex. F at 36:17-38:4.
[50]   Butler Dep., Ex. K at 62:13-63:3; Shamsie Dep., Ex. L at 84:12-23.
[51]   Clay Dep., Ex. J at 109:24-11:4.
[52]   Anderson Dep., Ex. F at 53:4-24.
[53]   2013 Form 1120 S, Ex. B at line 17.

LLC obtained a shareholder loan in 2016 in the amount of $23,937, which no other Plaintiff did.[54] As yet another difference, Shamsie decided to keep investing in his business in 2016 ($30,630), even after he stopped generating revenue, resulting in Clayton Paul Shamsie, LLC reporting a *loss* of over $30,000 in 2016.[55] It is, of course, impossible for an employee who performs services for wages to experience a "loss" as Shamsie reported to the IRS.

In sum, Plaintiffs differ in almost every way imaginable. They are similar only in that (1) they all signed agreements with New Tech expressly providing that they were independent contractors, (2) they all deducted business expenses and paid taxes as independent contractors, and (3) none of them had day-to-day contact with New Tech. Indeed, as Shamsie testified, "New Tech couldn't tell me where I was at or what I was doing or what was going on at any period of time. They didn't have a clue. And unless they seen my invoice, that's the only time they knew if I was working, what I was doing. … Unless we called them, we never had contact with New Tech."[56] Other than these facts, which support Plaintiffs' classification as independent contractors, there are no factual similarities upon which this action could be collectively tried.

## LEGAL STANDARD FOR CERTIFICATION OF COLLECTIVE ACTIONS

As the Fifth Circuit held, "once discovery is complete and the employer moves to decertify the collective action, the court must make a factual determination as to whether there are similarly-situated employees who have opted in."[57] The purpose of a collective is to provide efficiency, which cannot occur with individualized evidence that confuses the jury. "At this stage, courts are much less likely to allow the collective action to continue to trial."[58] Final certification is so rare because Plaintiffs bear the much heavier burden of showing why the class members are similarly situated, with proof of similarities "beyond the mere facts of job

---

[54]   Schedule G – Loans from Stockholders , pg. 123 of 124, Ex. D.
[55]   2016 Form 1120S, Ex. D.
[56]   Shamsie Dep., Ex. L at 73:14-74:2.
[57]   *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 915 n.2 (5th Cir. 2008).
[58]   *Portillo v. Permanent Workers, LLC*, 662 F. App'x 277, 281 (5th Cir. 2016).

duties and pay provisions."[59] Without such proof, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse."[60] Rather than the superficial similarities that may have supported conditional certification, at the decertification stage, "the relevant inquiry is whether there is a demonstrated similarity [of] some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice so that hearing the cases together furthers the purposes of Section 16, is fair to both parties, and does not result in an unmanageable trial."[61] As a result, "[f]inal certification is rarely granted."[62]

In evaluating whether Plaintiffs have proven that the collective members are in fact "similarly situated," the Court should consider "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendant] which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[63] "[C]ourts have held general allegations of an overarching policy to be insufficient – instead requiring substantial evidence of a single decision, policy or plan. The court will compare the named plaintiffs with the opt-ins, and evaluate the similarities and dissimilarities in employment responsibilities and circumstances."[64]

<u>ARGUMENT</u>

I.   <u>There is no Fifth Circuit case supporting certification of an independent contractor collective action and they are routinely decertified by other courts.</u>

Although there is no Fifth Circuit case in which the court analyzed whether to grant decertification in an independent contractor case, at least one court saw the futility of proceeding collectively in an independent

---

[59]   *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 710 n.1 (S.D. Tex. 2014); *Harrison v. Delguerico's Wrecking & Salvage, Inc.*, No. 13-5353, 2016 WL 826824, *3 (E.D. Pa. March 2, 2016) ("It must be stressed that the burden is on Named Plaintiff to establish that Plaintiffs have met the similarly situated requirement."); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007); *Rodriguez v. Niagara Cleaning Servs., Inc.*, No. 09-22645, 2010 WL 11505505, *4 (S.D. Fla. Dec. 14, 2010) ("Though they may all have performed similar tasks, *i.e.* cleaning, laundering, serving, etc., their job duties alone do not necessarily render them similarly situated under the FLSA.").

[60]   *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1013 (D. Kan. 2018) (citation omitted).

[61]   *Vanzzini*, 995 F. Supp. 2d at 720 (internal punctuation omitted).

[62]   *Gallender v. Empire Fire & Marine Ins. Co.*, No. 05-220, 2007 WL 325792, at *2 (S.D. Miss. Jan. 31, 2007).

[63]   *See Portillo*, 662 F. App'x at 281.

[64]   *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1001-02 (D. Kan. 2018).

10

contractor case and denied even <u>conditional</u> certification.[65] Specifically, in *Andel v. Patterson-UTI Drilling Co.*, the court denied conditional certification because there was no way the case could ultimately survive decertification; "the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot be applied to the class as a whole."[66]

Given the fact-specific nature of the analysis, numerous courts have likewise recognized that FLSA cases involving independent contractors are simply not susceptible to collective treatment. As one district court recently noted, decertification "is typical in cases where it must be determined whether the putative plaintiffs are employees or independent contractors. Courts typically deny collective certification in these cases because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole."[67]

Any discussion of decertification in the Fifth Circuit must begin with *Mooney v. Aramco Services Co.*[68] In *Mooney*, the Fifth Circuit affirmed decertification of an age discrimination collective action (which, like the FLSA, proceeds under 29 U.S.C. § 216(b)) because of differences in the factual and employment settings amongst the plaintiffs.[69] In explaining the heightened standard at decertification, as compared to conditional certification, the Fifth Circuit noted that "no representative class has ever survived the second stage of review."[70] Not much has changed in the intervening 23 years in the Fifth Circuit. Although a few independent contractor cases have survived decertification in other circuits, no court to have thoroughly considered the effect of the economic reality test on a collective proceeding has allowed the case to proceed on a collective

---

[65]     The Western District of Texas recently granted decertification in an independent contractor case due to the small class size (11 plaintiffs), without analyzing whether the economic realities test could be applied on a classwide basis. *See Wiatrek v. Flowers Foods, Inc.*, No. SA-17-CA-772-XR, 2018 WL 3040583, *8 (W.D. Tex. June 16, 2018).

[66]     280 F.R.D. 287, 290 (S.D. Tex. 2012); *see also Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660 (E.D. Pa. 2010) (same).

[67]     *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003 n.182 (D. Kan. 2018); *see also Demauro v. Limo, Inc.*, No. 8:10-cv-413-T-33AEP, 2011 WL 9191, *3 (M.D. Fla. Jan. 3, 2011) ("[t]he economic realities test is fact intensive and requires individualized analysis. Accordingly, a number of courts have determined that whether an individual is an independent contractor or an employee is not appropriate for determination on a class-wide basis.").

[68]     54 F.3d 1207 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

[69]     *Id.* at 1216.

[70]     *Id.* at 1214.

basis.[71] Rather, these courts recognize that a collective action would quickly devolve into an unmanageable series of mini-trials, at the expense of judicial efficiency and the defendants' due process rights to defend against each plaintiff's claim of misclassification.

For example, in *Spellman v. American Eagle Express, Inc.,* the court said "the test for determining whether a worker is an employee or an independent contractor under the FLSA requires an individualized examination of the worker's actual relationship with the alleged employer" in light of the economic realities test. No. 10-1764, 2013 WL 1010444, *3 (E.D. Pa. Mar. 14, 2013). The court found that "[t]he 'investment' factor … may weigh in favor of or against employment status, depending on the particular class members. Similarly, while some class members demonstrate the exclusivity, continuity, and permanence indicative of an employment relationship … several performed delivery and other services for other companies, and other class members worked for [defendant] for only a number of weeks or even days." *Id.* at *5. Notably, the court decertified the collective even though the plaintiffs had "shown all collective class members have signed the [same agreement] and that [defendant] subjects its drivers to certain policies controlling some aspects of how drivers perform their work." *Id.* **In particular, the argument about having signed the same contract "does not help Plaintiffs' cause, as economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."** *Id.* at *4 (citation omitted, ).

Similarly, in *Hernandez v. Fresh Diet, Inc.,* No. 12-cv-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014), the court rejected the argument that collective treatment was proper because plaintiffs "were all classified … as independent contractors and not paid overtime compensation." *Id.* at *4. As the court held:

---

[71]     Courts that permit independent contractor cases to proceed collectively tend to reach that outcome in different circumstances than here. For example, some courts deny decertification in large part because the court has already granted summary judgment to the plaintiff on the independent contractor question. *E.g., Randolph v. PowerComm Const., Inc.,* 309 F.R.D. 349 (D. Md. 2015). Other courts have denied decertification under a different test than is applied in the Fifth Circuit. *E.g., Verma v. 3001 Castor, Inc.,* No. 13-3034, 2016 WL 6962522 (E.D. Pa. Nov. 29, 2016) (considering factors such as whether exotic dancers were employed in the same corporate department, division, and location; whether they advanced similar claims; and whether they sought substantially the same form of relief). Still other courts have denied decertification based on the defendant's failure to rebut the plaintiffs' evidence of similarities, which is not the case here. *E.g., Hughes v. Burie,* No. 3:12-cv-332, 2014 WL 1572543 (N.D. Fla. Apr. 18, 2014).

> "Blanket misclassification arguments are insufficient at this stage, however. … Rather, Plaintiffs must demonstrate at this stage that they are similar in "relevant respects," i.e., with respect to the factors relevant to this Court's determination of whether they are employees or independent contractors under the FLSA which, as noted, can vary in any given case. … Specifically, while Plaintiffs are certainly similarly situated with respect to some factors, application of these factors is inconclusive as to whether Plaintiffs were employees or independent contractors in this case, such that Plaintiffs are unable to carry their burden to "demonstrate that the Defendant had a *common policy or plan* in violation of the FLSA *that negatively impacted the original and opt-in Plaintiffs*."

*Id.* at *4 (citation omitted) (emphasis in *Hernandez*). In particular, the court relied heavily on its finding that evidence on the control factor of the economic reality test was "not susceptible to common proof." *Id.* at *5. Accordingly, decertification was necessary.

Likewise, in *Harris v. Express Courier Int'l, Inc.*, No. 5:16-cv-05033, 2017 WL 5606751 (W.D. Ark. Nov. 21, 2017), the court first noted that it "must consider whether the factual variations in the class members' work conditions and methods of pay are so great that a fact-finder would be unable to apply the economic-realities test and make a one-size-fits-all decision on liability." *Id.* at *3. Notably, the *Harris* court granted decertification even though the plaintiffs argued that they were all uniformly classified as independent contractors, had all signed the same agreement, "were subject to the same corporate-level policies, procedures, and training programs"; "were subject to a common policy of local control"; and "were subject to common policies regarding pay." *Id.* at *1. Overriding all these commonalities, the court found that two of the economic realities factors (control and profit/loss) "are not capable of being decided on a classwide basis, and therefore, the ultimate decision as to whether [defendant's] couriers were misclassified cannot be made except on an individual basis." *Id.* at *5.

Finally, in *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977 (D. Kan. 2018), the court rejected the argument that plaintiffs were uniformly classified as independent contractors. *Id.* at 1002. The court went on to find that the plaintiffs "are not 'similarly situated' because the … relevant facts that must be considered under the 'economic realities' test widely vary between [plaintiffs], and thus, the 'totality of the circumstances' is unique to each [plaintiff]." *Id.* at 1003. Specifically, there was no common evidence of the control factor (*id.* at

1003-05), the profit/loss factor (*id.* at 1005-06), the investments factor (*id.* at 1007), or the permanency factor (*id.*). Ultimately, these differences overwhelmed any commonalities:

> Many [plaintiffs] exhibited characteristics that weigh in favor of "employee status." … But there were many other [plaintiffs] that exhibited characteristics that weigh in favor of "independent contractor status." … Thus, it cannot be said categorically that every [plaintiff] falls (or does not fall) under the auspices of the FLSA. Nor can it be said categorically that all [plaintiffs] are "economically dependent" on [defendant] or that each [plaintiff] is "in business for himself."

*Id.* at 1009. In the end, proceeding collectively "completely ignored the fact that [defendant] is still entitled to defend against each claim individually." *Id.* at 1011. And "it would be a miscarriage of justice" for any particular plaintiff to receive, or defendants to pay, damages that were "not actually owed." *Id.* at 1012.

Just like all these cases, and as shown by the factor-by-factor analysis in Section II, the independent contractor analysis that lies at the heart of this case will involve individualized evidence on each and every factor.[72] As a result, this Court should decertify the collective action.

## II.   The five-factor independent contractor test will require individualized evidence.

To avoid decertification, Plaintiffs must demonstrate that the five-factor economic reality test can be applied to each of them through common evidence.[73] In the Fifth Circuit, this means analyzing five factors aimed at elucidating the "economic reality" of the relationship: (1) permanency; (2) control; (3) skill and

---

[72]    The analysis in *Spellman, Hernandez, Harris,* and *Blair* is hardly unique. *See Lasseter v. Restaurant Delivery Developers, LLC,* No. 8:18-cv-1912-T-33TGW, 2018 WL 4091987, *2 (M.D. Fla. Aug. 28, 2018) (granting decertification because "the FLSA economic realities test could not be applied collectively in this case"); *Roberson v. Restaurant Delivery Developers, LLC,* --- F. Supp. 3d ----, 2018 WL 3056183 (M.D. Fla. Jun. 20, 2018) (same); *Adami v. Cardo Windows, Inc.,* No. 12-2804, 2016 WL 1241798, *7 (D.N.J. Mar. 30, 2016) (granting decertification in independent contractor case because "the record overwhelmingly paints a mixed picture of the window installers' independent contractor status"); *Griffith v. Fordham Fin. Mgmt., Inc.,* No. 12-cv-1117, 2016 WL 354985, *3 (S.D.N.Y. Jan. 28, 2016) ("Determining whether Plaintiffs were employees or independent contractors is not capable of resolution by classwide proof, and will instead require highly individualized inquiries."); *Dang v. Inspection Depot, Inc.,* No. 14-61857, 2015 WL 11598702, *2 (S.D. Fla. Nov. 6, 2015) (evaluating independent contractor status "requires an individual factual inquiry regarding the actual work performed by each individual employee [which] is not appropriate as a collective action."); *Shayler v. Midtown Investigations, Ltd.,* No. 12 cv 4685 (KBF), 2013 WL 772818, *9 (S.D.N.Y. Feb. 27, 2013) (same); *see also Peña v. Handy Wash, Inc.,* No. 14-20352, 2015 WL 11713032, *3 (S.D. Fla. May 22, 2015) ("Courts have typically denied collective certification of FLSA actions which allege employee / independent-contractor misclassification[.]"); *Carrera v. UPS Supply Chain Solutions, Inc.,* No. 10-60263, 2012 WL 12860750, *8 (S.D. Fla. 2012) (same).

[73]    As noted above, it is not enough that Plaintiffs show just <u>some</u> commonality as to <u>some</u> of the factors; numerous courts have decertified collective actions even when there is common evidence as to as many as three of the factors. *See, e.g., Blair,* 309 F. Supp. 3d at 1009; *Harris,* 2017 WL 5606751 at *5; *Hernandez,* 2014 WL 5039431 at *4); *Carrera,* 2012 WL 12860750 at *10 (even though some factors "might be capable of proof on a class-wide basis, the court finds that any uniformity in proof among those factors fails to offset the evidentiary variation" in the other factors).

initiative; (4) the worker's investment in the business; and (5) the worker's opportunity for profit or loss.[74] Ultimately, the "determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented."[75]

### A.    There is no common proof of control over each Plaintiff.

In examining the "control" factor, courts consider whether the plaintiffs are free to accept or reject jobs, whether they are free to engage in other business activities, whether plaintiffs set their own schedules, and whether their day-to-day activities were supervised by the alleged employer. *See Thibault*, 612 F.3d at 846-47 (cable splicer was an independent contractor where he decided how to perform his work and defendant never told him how to do the splicing); *Carrell*, 998 F.2d at 334 (welder was an independent contractor where he controlled the manner and details of work).[76];

As detailed in Section II(B) *infra*, Plaintiffs differed in <u>all</u> of these respects. Clay and Butler testified that they could and did turn down work, while Harvey and Warren testified that they never turned down a project.[77] Clay and Butler testified that the business entities they formed engage in business ventures other than rig clerk services – Clay has a rice and crawfish farm, while Butler runs a charter fishing business between rig clerk projects.[78] By contrast, Anderson testified that he never did any work on his days off, and Warren, Deckhard, and Holbrook did not even form their own business entities.[79]

Indeed, the only common evidence in this case is that New Tech had no control whatsoever over any of the Plaintiffs, who were each in business for themselves. As Shamsie explained, "New Tech couldn't tell me

---

[74]    *Thibault v. Bellsouth Telecommun's, Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).
[75]    *Id.* at 848.
[76]    *See also Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 566 (7th Cir. 2009) (finding that the worker was an independent contractor where he controlled the details of his work); *see also Mack*, 2012 WL 1067398, at *1-2 (finding control factor weighed in favor of independent contractor status because the gate guards could decline projects, could work for other companies, had no day-to-day supervision, and there was no control over how they performed their jobs); *Gate Guard Servs.*, 2013 WL 593418, at *4-7 (same).
[77]    Clay Dep., Ex. J at 52:24-55:15; Butler Dep., Ex. K at 85:18-25; Harvey Dep., Ex. M at 48:3-5; Warren Dep., Ex. G at 79:21-24.
[78]    Clay Dep., Ex. J at 28:13-29:12; Butler Dep., Ex. K at 87:23-88:17.
[79]    Anderson Dep., Ex. F at 45:10-13; Warren Dep., Ex. G at 39:24-40:18; Deckhard 1099's, Ex. I; Holbrook Dep., Ex. H at 66:6-12.

where I was at or what I was doing or what was going on at any period of time. They didn't have a clue. And unless they seen my invoice, that's the only time they knew if I was working, what I was going. … Unless we called them, we never had contact with New Tech."[80] In light of the material differences amongst the Plaintiffs with regard to the control factor, there is no common evidence that Plaintiffs could offer in support of their misclassification claim requiring decertification.

> B.    There is no common proof of each Plaintiff's opportunities for profit or loss.

In evaluating the Plaintiffs' opportunities for profit or loss, courts consider facts such as whether Plaintiffs could negotiate their compensation, whether Plaintiffs wrote off business expenses on their tax returns, and whether Plaintiffs could generate revenue from sources other than the alleged employer. *Carrell*, 998 F.2d at 333 (focusing on "year-end profits or losses"); *Thibault*, 612 F.3d at 848 ("The splicers here increased profits by controlling costs (repairs, supply costs, food, water, housing, etc.)"); *Gate Guard Servs. L.P.*, 2013 WL 593418, at *8-9 (finding that Plaintiffs ability to take jobs with other general contractors, landowners, or oil companies during the extended periods of time they have off between jobs and write off business expenses on their tax returns to be indicative of independent contractor status).

There is no common evidence capable of resolving whether the profit/loss factor weighs in favor of or against independent contractor status. For example, Clay and Warren never negotiated their fees, but Butler testified that he could and did negotiate.[81] This alone weighs in favor of decertification. *See Harris*, 2017 WL 5606751, *6 ("while most couriers testified that LSO completely controlled the manner in which they were paid, one courier claimed that he was able to negotiate a pay raise from LSO on his own behalf. … [Accordingly], there would be no way for a fact-finder to decide on a classwide basis the degree to which LSO affected the couriers' collective opportunity for profit and loss.").

Moreover, between 2012 and 2015, some Plaintiffs (Clay, Butler, Shamsie, Harvey, and Anderson)

---

[80]    Shamsie Dep., Ex. L at 73:14-74:2.
[81]    Clay Dep., Ex. J at 52:8-14; Warren Dep., Ex. G at 79:13-20; Butler Dep., Ex. K at 84:18-85:17.

generated revenues between $218,000 and $631,000 from New Tech, while others (Warren, Deckhard, and Baker) generated less than $61,000.[82] Likewise, Clay, Butler, Shamsie, Harvey, and Baker chose to establish independent business entities for tax or other reasons, while Anderson, Warren, Deckhard, and Holbrook did not.[83] Some Plaintiffs (Clay, Butler) were able to control ultimate profits and losses by diversifying their business ventures into areas like farming and charter fishing businesses, while others relied entirely on working as a rig clerk.[84] And, as noted above, Plaintiffs wrote off dramatically different amounts on their tax returns.[85] Further, each Plaintiff had full control over how many and which projects to work. Harvey and Warren, for example, never turned down a project from New Tech.[86] Butler, by contrast, admitted that he could turn down jobs without consequences and, if necessary, find a replacement to work for him.[87] Clay also admitted he could turn down work without negative repercussions.[88] In fact, Clay testified that he walked off a rig after accepting the job because he didn't like the accommodations.[89]

In light of the numerous material differences amongst the Plaintiffs with respect to the profit/loss factor, there is no common evidence tending to show Plaintiffs were misclassified.

C.     There is no common proof of each Plaintiff's investments in their businesses.

In evaluating Plaintiffs' investments in their businesses, the Court determines whether Plaintiffs have made the kinds of investments indicative of one who is in business for himself. *See Carrell*, 998 F.2d at 333-34 (recognizing that "Sunland's overall investment in each pipeline construction project was obviously significant" but finding determinative the fact that "Welders supplied their own welding equipment; and their investments in welding equipment averaged $15,000 per Welder.").

---

[82]     *See* Ex.'s B, C, D, E, O, Q, I, N.
[83]     *Id.*; Anderson Dep., Ex. F at 44:16-17; Warren Dep., Ex. G at 39:24-40:18; Deckhard 1099's, Ex. I; Holbrook Dep., Ex. H at 66:6-12.
[84]     *See* Ex.'s B, C, D, E, O, Q, N; Anderson Dep., Ex. F at 44:16-17; Warren Dep., Ex. G at 39:24-40:18; Deckhard 1099's, Ex. I; Holbrook Dep., Ex. H at 18:11-19:8, 21:4-22:8.
[85]     *See* Ex.'s B, C, D, E, O, Q.
[86]     Harvey Dep., Ex. M at 48:3-5; Shamsie Dep., Ex. L at 79:21-23.
[87]     Butler Dep., Ex. K at 85:18-25.
[88]     Clay Dep., Ex. J at 52:24-55:15.
[89]     *Id.*

As shown by Plaintiffs' tax returns, however, there is a wide divergence in terms of how much each Plaintiff invested in his respective business, and in what kinds of expenses Plaintiffs invested. For example, in 2013 and 2014, Clay invested $287,471 in Michael Clay Enterprises, Inc., while in the same period, Anderson invested just $15,313 in his business.[90] Similarly, Butler invested in a truck and trailer (presumably for the charter fishing business of LGB, Inc.), Shamsie invested in multiple vehicles, including a "delivery truck," while Michael Clay Enterprises, Inc. owned a pickup truck and Honda Civic.[91] These disparities in investments weigh in favor of decertification. *See Peña v. Handy Wash, Inc.*, 2015 WL 11713032 at *9 ("Plaintiffs made varying levels of investments depending on the size of their vehicles and their vehicles' capacity for accommodating non-ambulatory passengers; and one of the Plaintiffs incorporated his own business and claimed expenses beyond those generally recognized among the Plaintiffs, and also leased-to-own more than one vehicle. The varying levels of investment by Plaintiffs weigh heavily in favor of decertification.").

A global comparison of Plaintiffs' investments to New Tech's investments does not obviate the need for individualized evidence because such a global comparison is irrelevant. Indeed, it would make little sense to globally find that each Plaintiff's investment in his respective business was outweighed by New Tech's investment in its business – the fact that one company is bigger than another does not mean that the smaller business is an "employee."[92] Moreover, such an analytical shortcut would run contrary to the Fifth Circuit's instruction in *Carrell* and *Thibault* that it is comparative investments in the specific project, not overall investment in the business, which matters to independent contractor status. *See Carrell*, 998 F.2d at 333-34; *Thibault*, 612 F.3d at 847 ("The Court in *Carrell* 'recognized' the overall investment by the alleged employer, but it did not focus on it, as Thibault does in his brief. Instead, *Carell* compares the amount the alleged employer and employee each contribute to the specific job the employee undertakes").

---

[90]   2013 and 2014 Form 1120 S, Ex. B; Ex. O.
[91]   2013 Federal Asset Report Form 1120S, Ex. C; 2013 Federal Asset Report Form 1120S, Ex. D; Form 4563 Part V, Ex. B.
[92]   For example, a court reporter is, as a matter of economic reality, in business for himself whether he works for a solo practitioner (who has a comparable investment in her business) or a 2,000 lawyer firm (which obviously has a much larger investment). The court reporter is not transformed into an employee by virtue of contracting with a firm whose overall investment outweighs his own.

D.      There is no common proof of each Plaintiff's skills/initiative.

In examining the skills/initiative factor, the Court considers each plaintiff's experience, training, and ability to generate revenues or profits through business initiative, such as by forming separate business entities and affirmatively seeking work from alternative sources. *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312 (5th Cir. 1976) (question is whether workers have "viable economic status that can be traded to other . . .companies"); *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 228 (5th Cir. 2016) (court should look for some unique skill set or some ability to exercise significant initiative within the business").

The Plaintiffs have very different experience and training. Anderson and Butler had been rig clerks for years before affiliating with New Tech.[93] By contrast, the other plaintiffs had no rig clerk experience, and varying levels of general oilfield experience.[94] Some of the plaintiffs took the initiative to obtain their own training, while others were trained by operators or, in the case of Harvey, not trained at all.[95]

Plaintiffs showed different levels of business initiative because some formed their own separate business entities, while others did not; this weighs in favor of decertification *Spellman*, 2013 WL 1010444, *4 (finding it "most significant[]" that some plaintiffs had their own entities while others did not because "[t]his kind of entrepreneurial conduct strongly suggests an independent contractor relationship, while the absence of such activity is indicative of employment. … This disparity in 'employment' circumstances makes it impossible to determine whether members of the collective class as a whole are, as a matter of economic reality, dependent upon [defendant] for the opportunity to provide their services."). Plaintiffs also differed in how they found work. Shamsie, Anderson, and Harvey brought their own work to New Tech, while Clay asked New Tech for work when business was slow.[96] There is no common evidence that can be offered in support of Plaintiffs' claim that the skills/initiative factor weighs in favor of misclassification.

---

[93]     Anderson Dep., Ex. F at 10:11-13:10; Butler Dep., Ex. K at 27:23-31:14.
[94]     Clay Dep., Ex. J at 35:5-38:7; Harvey Dep., Ex. M at 13:13-20.
[95]     Anderson Dep., Ex. F at 39:13-40:17; Warren Dep., Ex. G at 18:25-20:12; Shamsie Dep., Ex. L at 25:22-27:1; Clay Dep., Ex. J at 32:5-34:6, 57:9-58:1; Butler Dep., Ex. K at 33:16-36:2.
[96]      Shamsie Dep., Ex. L at 121:10-16; Anderson Dep., Ex. F at 18:8-11; Harvey Dep., Ex. M at 24:11-24; Clay Dep., Ex. J at 120:8-16.

E.   There is no common proof of each Plaintiff's permanency.

In evaluating the permanency factor, the Court considers whether the relationship was project-based and nonexclusive. *See Thibault*, 612 F.3d at 846; *Carrell*, 998 F.2d at 332; *Mack*, 2012 WL 1067398, at *4-6; *Gate Guard*, 2013 WL 593418, at *10. In this case, the Plaintiffs worked for different lengths of time, from just 2 months up to 15 years.[97] Thus, no single Plaintiff (or even subset of Plaintiffs) can offer class-wide testimony in regards to the permanency factor.

As with the control factor, to the extent there is any commonality amongst the Plaintiffs, it weighs *in favor of* independent contractor status. To be sure, <u>all</u> of Plaintiffs worked on a non-exclusive, project-by-project basis, with no guarantee of future work from NTG after a project ended, which supports their status as independent contractors. (Cress Dec. at ¶ 8). Plaintiff must show that common evidence would <u>support</u> their claims.[98] But because the only common evidence related to the permanency factor <u>undermines</u> Plaintiffs' claims, it cannot defeat decertification.

III.   <u>New Tech's Individualized Defenses Weigh In Favor of Decertification</u>

"In cases where the evidence suggests a wide disparity in the relevant factual circumstances, the individualized defenses prong of the decertification analysis mirrors the disparate employment settings prong. Quite simply, a defendant cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other."[99] Accordingly, for all the reasons that the disparate factual settings factor weighed in favor of decertification, the individualized defenses also weigh in favor of decertification. Moreover, there is no question that New Tech "is still entitled to defend against each claim

---

[97]   Butler Dep., Ex. K at 50:5-57:24; Clay Dep., Ex. J at 15:13-16:3; Baker Personnel File, Ex. N; Warren Dep., Ex. G at 28:2-7; Shamsie Dep., Ex. L at 12:9-12; Harvey Dep., Ex. M at 11:14-22; Anderson Dep., Ex. F at 12:15-18:11; Ex. I; Holbrook Dep., Ex. H at 76:12-18, 78:4-6.

[98]   *See Burch v. Qwest Communications Int'l, Inc.*, 677 F. Supp. 2d 1101, 1114 (D. Minn. 2009) (at decertification, plaintiff must prove "a common policy or plan *in violation of the FLSA* that negatively impacted the original and opt-in Plaintiffs") (emphasis added).

[99]   *Hernandez*, 2014 WL 5039431 at *6 (citations omitted).

individually."[100] And New Tech's defenses must be applied on an individualized basis.

First, even if the Plaintiffs were all misclassified, New Tech is still entitled to defend against some or all of the Plaintiffs' overtime claims by arguing that they are exempt. There are at least two exemptions at issue: the administrative exemption (29 C.F.R. § 541.200) and the highly-compensated exemption (29 C.F.R. § 541.601). Different exemptions may apply to different Plaintiffs, with some earning well over $100,000 annually (the threshold for the highly compensated exemption) and others earning less.[101] "With unique exemptions applicable to multiple Plaintiffs, this Court would have to apply numerous tests applying different factors for each individual Plaintiff while analyzing their various diverse job responsibilities."[102]

Second, even if Plaintiffs are employees and nonexempt, New Tech is still entitled to defend against each Plaintiff's overtime claim by showing that some or all of the time they claim to have worked was in fact noncompensable time.[103] This will require an individualized assessment of each Plaintiff's activities. For example, Anderson testified that some of his time on projects was spent playing video poker or watching TV, and Clay testified that some of his time on projects was spent engaging in his crawfish and rice farming business.[104] Neither of these activities constitutes compensable time. *See* 29 C.F.R. Part 785, Subpart C. New Tech is entitled to explore, on a plaintiff-by-plaintiff basis, whether and how much of their time was spent on noncompensable activities. As one court recently noted, "[t]his defense cannot be offered on a class-wide basis, and therefore weighs in favor of decertification."[105]

Third, with just six Plaintiffs remaining in the case, New Tech is entitled to cross-examine each

---

[100]   *Blair*, 309 F. Supp. 3d at 1011.
[101]   *See* Ex.'s B, C, D, E, I, N, O, P.
[102]   *Harrison v. Delguerico's Wrecking & Salvage, Inc.*, No. 13-5353, 2016 WL 826824, *7 (E.D. Pa. March 2, 2016).
[103]   *Roberson*, 2018 WL 3056183 at *7 ("even if the Court were able to determine that all opt-in Plaintiffs were employees, Defendants would still have other individualized defenses available to them," including the number of hours worked by each plaintiff); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 586 (N.D. Cal. 2016) (granting decertification where "there are wide variations among the players as to the types of activities in which they engaged and the circumstances under which they engaged in them, which will give rise to a plethora of individualized inquiries relating to the determination of the amount of compensable work Plaintiffs performed").
[104]   Anderson Dep., Ex. F at 31:1-32:14; Clay Dep., Ex. J at 28:13-29:12, 74:16-75:6.
[105]   *Blair*, 309 F. Supp. 3d at 1011.

Plaintiff, so that the jury can evaluate the credibility of their claims regarding their status as independent contractors and damages. Indeed, New Tech, "has a right to attack the accuracy of testimony, particularly representative testimony. The Court recognizes that such individual questioning would likely make it difficult and confusing for the fact finder," and weighs in favor of decertification.[106]

Fourth, to the extent Holbrook, the gate guard, remains in the class, his claims are subject to unique defenses. In particular, New Tech is entitled to defend against Holbrook's claims by reference to Fifth Circuit case law holding that the very same claim he is asserting is so frivolous as to deserve sanctions. *See Gate Guard Services, LP v. Perez*, 792 F.3d 554 (5th Cir. 2015). Indeed, Holbrook's extreme differences from the other Plaintiffs is precisely why Holbrook, but no other Plaintiff, is subject to a motion for summary judgment as to his status as an independent contractor.

Accordingly, even if independent contractor status could be determined collectively (it cannot), New Tech's individualized defenses defeat the purpose of a collective action, and require decertification.

IV. <u>Fairness and judicial efficiency weigh in favor of decertification.</u>

A. The small size of this collective, standing alone, weighs in favor of decertification.

At most, there are nine Plaintiffs – three of whom (Deckhard, Baker, and Holbrook) are the subject of pending motions to dismiss. There is no sense in implementing the procedures of a collective action for just six (or even nine) plaintiffs. "While Section 216(b) does not have a numerosity requirement, the apparent lack of enthusiasm by the class indicates that a collective action is inappropriate."[107] Indeed, the Western District of Texas decertified a collective action because there were just eleven plaintiffs.[108] As one court reasoned, "there is a vast difference between granting decertification regarding a potential class of hundreds, or even dozens, and thereafter facing as many individual suits, and granting decertification regarding two potential class

---

[106]    *White v. 14051 Manchester, Inc.*, 301 F.R.D. 368, 377 (E.D. Mo. 2014) (citations and alterations omitted).
[107]    *Griffith v. Fordham Fin. Mgmt., Inc.*, No. 12-cv-1117(PAC), 2016 WL 354895, *3 (S.D.N.Y. Jan. 28, 2016) ("extremely low number of opt-ins relative to the number of potential class members weighs against certification.").
[108]    *Wiatrek*, 2018 WL 3040583 at *8 (in independent contractor FLSA case, holding that "because there are only eleven remaining plaintiffs, the FLSA class is decertified").

members."[109] Given the lack of interest by the hundreds of individuals who chose not to opt-in to this litigation, the this case should not proceed collectively.

**B.      Preservation of New Tech's due process rights favors decertification.**

"Available defenses and procedural fairness go hand-in-hand, as the efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of a defendant's due process rights."[110] As one district court recently noted, "[a]n all-or-nothing determination of whether all opt-in Plaintiffs were independent contractors or employees could prejudice either Plaintiffs or Defendants. … To avoid such [an] inequitable all-or-nothing determination, 'the Court would be forced to utilize numerous subclasses, individualized evidence, individualized liability determinations, and individualized damage determinations.' 'Under those circumstances, a collective action no longer poses benefits in terms of manageability or fairness and is not preferable to individual actions spread across the appropriate federal venues nationwide.'"[111] Indeed, "[i]t would be a miscarriage of justice" to paint all Plaintiffs with a broad brush, such that some undeserving plaintiffs receive damages, or some deserving plaintiffs do not.[112] As one court reasoned, "proceeding as a collective action here will inevitably lead to one of two results – it would either prejudice [defendant's] ability to present [its] defenses, or require mini-trials for each of the opt-in plaintiffs. … As these are equally undesirable results, the Court must decertify the collective action."[113] In light of the risk proceeding collectively poses to New Tech's right to defend, this Court should decertify this action.

**C.      Plaintiffs Will Not Be Unduly Prejudiced By Decertification**

Plaintiffs are likely to argue that they will be prejudiced by decertification because proceeding collectively will be less expensive for each of them. But this, standing alone cannot prevent decertification,

---

[109]      *Vanzzini*, 995 F. Supp. 2d at 723; *see also Adami*, 2016 WL 1241798 at *11 ("any minimal savings in time and resources that might be had in adjudicating one collective action … instead of trying three smaller cases is erased when the court considers the inevitability of three mini trials in any case."); *Keef v. M.A. Mortenson Co.*, No. 07-cv-3915(JMR), 2009 WL 465030, *3 (D. Minn. Feb. 24, 2009) (decertifying in view of "the limited number of potential plaintiffs who have chosen to opt-in").
[110]      *Scott v. Chipotle Mexican Grill, Inc.*, 2017 WL 1287512, *9 (S.D.N.Y. 2017).
[111]      *Roberson*, 2018 WL 3056183 at *8 (citation omitted).
[112]      *Blair*, 309 F. Supp. 3d at 1012.
[113]      *Hernandez*, 2014 WL 5039431 at *6.

23

because it is true of <u>every</u> collective action. Plaintiffs' cost savings cannot justify proceeding collectively at the expense of judicial efficiency and New Tech's due process rights."[114] Indeed, to the benefit of the parties and the judiciary, any follow-on litigation brought by current opt-ins will be streamlined by virtue of the parties having already conducted class-wide discovery in this action.[115]

In sum, each of the factors considered by courts at the decertification stage (disparate factual and employment settings, individualized defenses, and fairness and efficiency) weighs heavily in favor of decertification. Accordingly, this Court should join the vast majority of courts nationwide and decertify this independent contractor misclassification FLSA case.

## V.   Named Plaintiffs' Claims Should Be Severed

Decertification will result in all opt-in plaintiffs being dismissed without prejudice.[116] But this will still leave three named plaintiffs (Clay, Butler, and Shamsie) in this action. As shown above, however, there is no evidence of a common policy of New Tech that violates the FLSA, and the named plaintiffs' individual circumstances differ in ways that are material to the independent contractor analysis. Accordingly, the claims of Clay, Butler, and Shamsie should be severed so that any misclassification allegations are tried on a single-plaintiff basis. *See* Fed. R. Civ. P. 20(b), 21 (providing for severance of parties and claims).

Under Rule 20(a)(1), plaintiffs may only be joined in one action if "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." When parties do not satisfy that standard, "the court may at any time, on just terms, add or drop a

---

[114]     *See Rodriguez v. Niagara Cleaning Servs., Inc.*, No. 09-22645, 2010 WL 11505505, *5 (S.D. Fla. Dec. 14, 2010) ("While, surely, pooling the resources of individual Plaintiffs with small claims benefits those Plaintiffs, the Court must also determine whether trying such claims together is an efficient use of the Court's resources.").

[115]     *See Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012) ("While decertification places opt-in Plaintiffs at 'square one,' they are not overly prejudiced because many have likely benefitted from the implementation of class-wide discovery on many of the issues relevant to their FLSA claims."); *Smith v. Frac Tech Servs., LLC*, No. 4:09cv000679, 2011 WL 96868, *18 (E.D. Ark. Jan. 11, 2011) ("because the class was certified throughout the discovery period, the plaintiffs benefitted from discovery as to many of the relevant issues.").

[116]     *See Portillo,* 662 F. App'x at 281, (citing *Sandoz,* 553 F.3d at 915 n.2).

part. The court may also sever any claim against a party." Fed. R. Civ. P. 21. Notably, <u>Rule 20 imposes a higher threshold than the FLSA's "similarly situated" test</u>. As one court noted, "Rule 20 refers to the *same* transaction or occurrence, not to *similar* transactions or occurrences."[117]

The Fifth Circuit has applied an analysis similar to decertification to affirm a district court's decision to not allow FLSA plaintiffs to join claims together under Rule 20 when they are not similarly situated. *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516 (5th Cir. 2010). In that case, individuals who had not survived decertification sought joinder under Rule 20. The Fifth Circuit, however, affirmed the district court's decision to disallow joinder for the same reasons that it was proper to decertify the collective in the first place: "working conditions do not appear to have been uniform at all Allsup's stores. The district court was within its wide discretion to conclude that trying these claims together would be too challenging logistically, given the divergent working conditions at each store and the different defenses applicable to each plaintiff's claims." *Acevedo*, 600 F.3d at 522; *see also Lasseter*, 2018 WL 4091987 at *4 (denying joinder to former opt-ins for same reason that decertification was granted).

Thus, for the same reasons that decertification should be granted, the claims of the named plaintiffs should be severed. The only viable way to proceed with Plaintiffs' claims that they were misclassified as independent contractors is on an individual basis.

<u>Conclusion</u>

WHEREFORE, for all the foregoing reasons, New Tech requests that the Court (1) GRANT its Motion for Decertification, decertify this action, and dismiss all opt-in plaintiffs without prejudice and (2) GRANT its motion to sever and sever the claims of named plaintiffs Butler and Shamsie so that those claims may be pursued in separate, individual actions.

/s/ Annette A. Idalski
Annette A. Idalski
Pro Hac Vice

---

[117]   *Hartley v. Clark*, No. 3:09-cv-559, 2010 WL 1187880, *3 (N.D. Fla. Feb. 12, 2010).

Peter N. Hall
Pro Hac Vice

CHAMBERLAIN HRDLICKA WHITE WILLIAMS & AUGHTRY
191 Peachtree Street, NE, 46th Floor
Atlanta, Georgia 30303-1747
Telephone: (404) 658-5386
Annette.idalski@chamberlainlaw.com
Peter.hall@chamberlainlaw.com

/s/ Donna Phillips Currault
Donna Phillips Currault # 19533
Ryan McAlister # 37788

GORDON, ARATA, MONTGOMERY, BARNETT, MCCOLLAM, DUPLAINTS & EAGAN, LLC
201 St. Charles Ave. 40th Floor
New Orleans, Louisiana 70170-4000
Telephone: (504) 569-1862
dcurrault@gamblaw.com
rmcallister@gamblaw.com

Attorneys for Defendant, New Tech Global Ventures, LLC

Dated: October 10, 2018

## CERTIFICATE OF SERVICE

This is to certify that on October 10, 2018, I electronically filed the foregoing DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION through the Court's CM/ECF system which will send a notice of electronic filing to counsel of record, as follows:

Kenneth St. Pé
KENNETH D. ST. PÉ, LLC
311 West University Avenue, Suite A
Lafayette, LA 70506
(337) 534-4043

Matthew S. Parmet
Parmet PC
800 Sawyer Street
Houston, TX 77007

/s/ Annette A. Idalski
Annette A. Idalski