# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

MICHAEL D. CLAY, ET AL.

          CIVIL ACTION

VERSUS

          NO. 16-296-JWD-CBW

NEW TECH GLOBAL VENTURES, LLC

## RULING AND ORDER

This matter comes before the Court on the following motions filed by Defendant New Tech Global Ventures, LLC ("New Tech"):

(1) Motion to Enforce Stipulated Class Definition by Striking and/or Severing Claims Asserted by Opt-In Plaintiff Holbrook (Doc. 71);

(2) Motion for Partial Summary Judgment (Doc. 89);

(3) Motion for Decertification and to Sever Named Plaintiffs' Claims (Doc. 90); and

(4) Motion for Summary Judgment as to Opt-In Plaintiff Gene Holbrook (Doc. 94).

Also before the Court is the Motion for Summary Judgment as to Employee Status, Liability/Backwages, and New Tech's Good Faith Defense (Doc. 91) filed by Plaintiffs Michael D. Clay, Larre Butler, Clayton Shamsie, Joshua Warren, Joseph Anderson, John Harvey, and Gene Holbrook (collectively, the "plaintiffs").

Many of the motions are interrelated and include overlapping factual and legal issues. Accordingly, the Court consolidates their disposition into this single Ruling and Order after hearing oral argument on February 6, 2019.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

Plaintiffs Michael Clay, Larre Butler, and Clayton Shamsie (collectively, the "original plaintiffs" or "named plaintiffs") filed this lawsuit on March 3, 2016. (Doc. 1). They allege that New Tech improperly classified them as independent contractors and failed to pay them overtime as required by the Fair Labor Standards Act ("FLSA"). On September 28, 2016, the Magistrate Judge granted the parties' Stipulation and Agreed Motion for Conditional Certification and Court-Authorized Notice (Doc. 17), conditionally certifying a class of "[a]ll current and former workers of [New Tech] retained as 'Rig Clerks' during the period of March 3, 2013, to March 3, 2016." (Doc. 19 at 1). Eligible class members were given 60 days to opt in to the litigation. (*Id.* at 2). By December 20, 2016, six additional plaintiffs had opted in: Joshua William Warren, Joseph LaVelle Anderson, Albert Deckard, Gene Lee Holbrook, Brett Allen Baker,[1] and John Robertson Harvey (collectively, the "opt-in plaintiffs") (*See* Docs. 20–25). After New Tech answered the complaint, the case then proceeded to discovery.

On August 14, 2018, before the completion of discovery, the first of the case's several pending motions was filed. (*See* Doc. 68). Thereafter, the parties engaged in an extensive course of motions practice, culminating in the several motions for which the Court heard oral argument on February 6, 2019. On February 20, 2019, the Court granted New Tech's motion to dismiss Deckard's claims with prejudice (Doc. 68) during a telephonic status conference. (*See* Doc. 153).[2]

**B.      Facts**

New Tech is a staffing company which provides project management and consultancy services to independent oil and gas companies operating drilling rigs. (Doc. 90-2 at 2). New Tech provides workers to these independent operators who have experience in the various different

---

[1] On February 5, 2019, counsel for the plaintiffs informed the Court that Baker would be withdrawing his consent to opt in to this lawsuit. (Doc. 134). The parties orally moved to dismiss Baker during oral argument, and the Court granted their motion. (*See* Doc. 137).
[2] The Court denied that part of New Tech's motion requesting expenses and attorney's fees. (Doc. 153).

drilling practices in which the operators engage.[3] (*Id.* at 1–2). The workers New Tech provides use their oil rig experience to help independent operators compete with larger competitors in the industry. (*Id.*). Due to these operators' size, they are unable to directly employ the number of employees with experience in different drilling practices they need to compete with larger producers. (*Id.* at 1). Thus, they contract with New Tech to acquire these workers. (*Id.*).

Clay, Butler, and Shamshie are "rig clerks"—workers who support logistical operations and "cost tracking" for both onshore and offshore drilling rigs. (Doc. 90-2 at 3; *see also* Doc. 90-11 at 16; Doc. 90-12 at 11–12 & 16; Doc. 90-13 at 6). Rig clerks perform a variety of duties, including: ensuring that a rig's staffing and equipment needs are met, keeping track of daily costs on the rig, coordinating onshore supplies and transportation, handling customs and border issues, creating manifests for supply boats and helicopters, and the preparation of daily reports. (Doc. 90-2 at 3). New Tech states that it classifies its rig clerks as independent contractors based on industry standards, the advice of legal counsel, and the results of an Internal Revenue Service ("IRS") audit. (Doc. 89-3 at 3–9). It maintains that it has no "role in day-to-day job duties or assignments for rig clerks that it matches with operators." (*Id.* at 3).

According to New Tech CEO Larry Cress, rig clerks work on a "project-to-project basis with no guarantee of future work." (Doc. 103-14 at 2). He asserts that rig clerks are "not supervised by any New Tech employees nor are they subject to discipline from New Tech employees." (*Id.*). He maintains that rig clerks are permitted to turn down job assignments from New Tech and that there is "no penalty to any rig clerk for turning down any job offered." (*Id.* at 3). New Tech pays rig clerks "only . . . when they are performing services through New Tech." (*Id.*). New Tech "does not pay a salary or any other form of regular compensation to rig clerks" because it considers them

---

[3] These oil and gas companies will be referred to as "operator" or "customer" throughout this Ruling and Opinion.

to be independent contractors. (*Id.*). Rig clerks are "free to contract directly with operators . . . pursuant to the terms of their consultant agreements." (*Id.*).

The plaintiffs maintain that they qualify as employees and should have been paid overtime by New Tech under the Fair Labor Standards Act. (*See generally* Doc. 91-1). They generally assert that New Tech had significant control over their job duties, and that it classified rig clerks as independent contractors to avoid its duty to comply with the requirements of the FLSA. (*Id.*).

## II. DISCUSSION

**A.    New Tech's Motion to Sever (Doc. 71)**

New Tech argues that opt-in Plaintiff Gene Holbrook's claim should be stricken and/or severed because he was not a rig clerk and does not fall within the defined scope of the collective. (*See generally* Doc. 71-1). The plaintiffs respond that under the FLSA, Holbrook needs only to be "similarly situated" to the members of the collective and that this requirement is more flexible than the requirements for joinder of parties under Federal Rule of Civil Procedure 20. (Doc. 77 at 2). They assert that because New Tech has purportedly misclassified employees as independent contractors, the fact that Holbrook was a gate guard instead of a rig clerk is not dispositive.[4] (*Id.* at 2–3).

Section 216(b) of the FLSA permits a collective action against an employer for unpaid overtime compensation "by any one or more employees for and in behalf of himself or themselves

---

[4] Counsel for the plaintiffs asserted during oral argument that the plaintiffs do not concede that Holbrook is a gate guard. However, plaintiffs explicitly concede that Holbrook is a gate guard in multiple instances in their brief. (*See* Doc. 77 at 1 ("Despite any difference in job titles, Holbrook's job duties and pay show that he is similarly situated under the relevant standard to be part of this class."); Doc. 77 at 4 ("Holbrook testified that as a gate guard, his most time-consuming task was screening and recording the people who came in and out."); Doc. 77 at 5–6 ("New Tech wants the Court to believe that Holbrook is different than the rig clerks because he, as a gate guard, 'invested in his own living quarters,' whereas the rig clerks 'stayed on offshore rigs.'"). Thus, it is clear that the plaintiffs admit, and the evidence in the record supports, that Holbrook is a gate guard. They argue instead that his duties were still similar enough to be included in the class. Even if the parties did not stipulate to a class of rig clerks, the Court would reject this argument.

and other employees similarly situated." 29 U.S.C. § 216(b).  No extensive analysis is warranted here, however, because the Magistrate Judge conditionally certified a class of "[a]ll current and former workers of Defendant retained as 'Rig Clerks' during the period of March 3, 2013, to March 3, 2016." (Doc. 19 at 1).  This, of course, came in an order granting the parties' joint motion for conditional certification in which the parties "agreed and stipulate to conditional certification of" all current and former New Tech rig clerks employed from Mach 3, 2013, to March 3, 2016. (Doc. 17 at 2).  The "effect of a conditional certification is that a court-approved written notice may then be sent to similarly situated putative class members." *Nieddu v. Lifetime Fitness, Inc.*, 977 F. Supp. 2d 686, 690 (S.D. Tex. 2013).

The plaintiffs conceded that Holbrook is a gate guard, not a rig clerk, and it is clear from the record that there are objectively substantial differences between the two positions.  Regardless of whether gate guards can be considered "similarly situated" for FLSA conditional certification purposes, the parties are expressly bound by their stipulation and the Court's September 28, 2016 Order (Doc. 19).  Accordingly, New Tech's motion to sever Holbrook's claims (Doc. 71) is granted, and Holbrook's claims are dismissed without prejudice.[5]

**B.    New Tech's Motion for Partial Summary Judgment (Doc. 89)**

Next, New Tech moves for partial summary judgment on the issues of liquidated damages and the statute-of-limitations period. (*See generally* Doc. 89-1).  The plaintiffs oppose the motion primarily on the grounds that it is premature. (*See generally* Doc. 106).

**1.    Relevant Facts**

---

[5] In light of this ruling, New Tech's motion for summary judgment as to Holbrook (Doc. 94) is DENIED AS MOOT. Nevertheless, the Court notes that based on the record before it and the representations made during oral argument, Holbrook would not survive past the decertification stage based on the substantial differences in Holbrook's duties and responsibilities as a gate guard from those of the rest of the plaintiffs as rig clerks.

New Tech CEO Larry Cress submitted a declaration in which he asserts that other third-party staffing companies in the oil and gas industry employed rig clerks as independent contractors and not full-time employees. (Doc. 89-3 at 3). Realizing the legal significance of the classification of individuals as independent contractors instead of employees, Cress also sought the advice of four attorneys: Roy Keezel, New Tech's in-house counsel from 2005 to 2011; Ken Boiarsky, outside tax counsel; Bruce Williams, personal injury attorney; and Charles Conrad, also a personal injury attorney. (*Id.* at 4). Cress believed Keezel was specifically knowledgeable about classification issues based on his legal experience counseling employers on classification of their workers. (*Id.*). Keezel had previously litigated for the IRS, which included investigating employers' classification decisions. (*Id.*). Keezel also had knowledge of the typical practices of other businesses in the oil industry. (*Id.*). On several occasions, Keezel advised Cress and New Tech's board that rig clerks were properly classified as independent contractors under federal law, Texas law, and workers' compensation exclusivity provisions, confirming that "this classification was consistent with the predominant and longstanding industry practice with which both Mr. Cress and Mr. Keezel were familiar." (*Id.* at 4–5).

Williams is a personal injury defense attorney. (Doc. 89-3 at 6). In April 2015, he provided New Tech with an analysis explaining his opinion that New Tech's workers were independent contractors and not employees. (*Id.*). Williams' analysis was based in part on personal injury lawsuits against New Tech which included allegations that its workers were employees and not independent contractors. (*Id.*). Similarly, Conrad is a personal injury defense attorney who, in March 2015, provided New Tech with an analysis concluding that New Tech properly classified its workers as independent contractors. (*Id.*). Conrad's analysis was also based on lawsuits he had defended on behalf of New Tech. (*Id.* at 6–7).

In reliance on this advice, Cress instructed New Tech employees to treat rig clerks as independent contractors by refraining from: supervising them, expressing opinions regarding their schedules, commenting on their job duties, and offering supplies or equipment or reimbursement if they purchased their own. (Doc. 89-3 at 7). He also instructed New Tech employees to negotiate with rig clerks regarding their rate of pay, and allow them to accept or reject job assignments or work for competitors. (*Id.*). Finally, he instructed his employees to tell rig clerks that they were free to bring work to New Tech through their own independent business relationships.[6] (*Id.*).

In 2015, the IRS conducted an audit into New Tech's classification of its workers. (Doc. 89-3 at 8). New Tech hired Boiarsky to represent it in the audit. (*Id.*). On April 6, 2015, the IRS concluded its audit by determining that New Tech had properly classified its workers as independent contractors instead of employees. (*Id.*).

Cress testified that he has not at any time "received any notice, complaint or allegation that New Tech's classification of rig clerks as independent contractors is, or may potentially be, incorrect or in violation of the FLSA." (Doc. 89-3 at 9). Cress concluded his declaration by declaring that New Tech's decision to classify its workers as independent contractors is based on his "knowledge of the industry, the IRS determination finding New Tech rig clerks are independent contractors, and consistent advice from both internal counsel and external counsel." (*Id.*).

## 2. Parties' Arguments

New Tech maintains that liquidated damages are not proper under FLSA because it has acted reasonably and in good faith. (Doc. 89-1 at 13–17). Specifically, New Tech argues that it has acted in good faith because it relied on industry standards, the advice of counsel, and IRS investigations in its decision to classify rig clerks as independent contractors. (*Id.*). New Tech

---

[6] The Court is careful to note that for the purposes of this or any other motion, it is making no finding with respect to whether or not New Tech, in practice, followed this course of action.

additionally urges that the FLSA's statute-of-limitations period extends to three years only in the event of a willful violation, and that the plaintiffs cannot demonstrate a willful violation because New Tech acted in good faith. (*Id.* at 17–20). Nevertheless, according to New Tech, even if it had not produced evidence of good faith, the plaintiffs cannot establish that it either committed a knowing FLSA violation or acted in reckless disregard. (*Id.* at 20–28).

According to the plaintiffs, the issues of good faith and willfulness cannot be decided before liability is determined. (Doc. 106 at 8–12). Specifically, issues of credibility and New Tech's state of mind in classifying rig clerks as independent contractors are to be decided at trial, not at the summary judgment stage. (*Id.* at 10–12). The plaintiffs then take issue with the substance of New Tech's argument that it acted in good faith, asserting that following industry standards is not evidence of good faith in a FLSA case. (*Id.* at 12–14). The plaintiffs also claim that because New Tech made the decision to classify rig clerks as independent contractors in 2013, any events it points to that occurred thereafter are irrelevant. (*Id.* at 14–15). Finally, the plaintiffs argue that New Tech's reliance on the advice of its counsel was unreasonable. (*Id.* at 15).

### 3. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must "go beyond the pleadings" and submit competent evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

The Fifth Circuit has further explained:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

### 4.  Liquidated Damages

Section 260 of the FLSA provides:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

"The good faith defense is considered a matter for the court to decide." *Lipnicki v. Meritage Homes Corp.*, No. 3:10-cv-605, 2014 WL 923524, at *12 (S.D. Tex. Feb. 13, 2014). "[A]n

employer faces a substantial burden of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA." *Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (internal quotation marks omitted). Moreover, courts in this and other circuits regularly defer ruling on liquidated damages where liability has not been determined. *See, e.g.*, *Randolph v. PowerComm Const., Inc.*, No. GJH-13-cv-1696, 2014 WL 4981439, at *4 (D. Md. Oct. 1, 2014) ("It would be hasty and unreflective for the Court to take on the liquidated damages inquiry before deciding whether the employer violated the FLSA. Thus, Defendants' motion to limit damages is premature."); *Lipnicki*, 2014 WL 923524, at *12 (Because good faith is decided by the court, "courts do not need to make a good faith ruling until after the jury has rendered a verdict finding violations."); *Brubach v. City of Albuquerque*, 893 F. Supp. 2d 1216, 1237 (D.N.M. 2012) ("[T]he Court notes that a ruling as a matter of law on the question of liquidated damages is premature because there has been no determination of underlying FLSA liability against the [defendant]."); *Bass v. City of Jackson, Miss.*, 878 F. Supp. 2d 701, 712 (S.D. Miss. 2011) ("Because of the factual disputes and more importantly because liability has not been established, the Court denies Plaintiffs' motion for summary judgment on [their liquidated damages claim."); *Robertson v. Bd. of Cnty. Comm'rs of Cnty. of Morgan*, 78 F. Supp. 2d 1142, 1162 (D. Colo. 1999) (deferring ruling on liquidated damages and limitations period until trial).

The Court here will adopt the approach of other district courts throughout the country and decline New Tech's invitation to determine the issue of damages before a liability finding is made. Moreover, the Court notes that on the record before it, New Tech has very likely not met its heavy burden to demonstrate as a matter of law that it acted in good faith and on a reasonable belief that it was not violating the FLSA. Combining the damages and statute-of-limitations issues, New Tech cites to case law supporting the proposition that a court can rule on willfulness at the

summary judgment stage before a liability finding is made. (*See* Doc. 109 at 2). But New Tech points to no case granting a defendant's motion for summary judgment on liquidated damages before a liability determination was made. In fact, the case law New Tech cites arguably undercuts its position. *See, e.g.*, *Mohnacky v. FTS Intern. Servs., LLC*, No. SA-13-cv-246-XR, 2014 WL 4967097, at *8 (W.D. Tex. Oct. 2, 2014) (denying a plaintiff's motion for partial summary judgment on limitations period); *Lipnicki*, 2014 WL 923524, at *16 (denying in part the defendant's motion for summary judgment "with respect to the good faith defense without prejudice to re-urging the defense in a post-trial motion *if there is a liability finding*") (emphasis added).

Moreover, significant questions of fact exist regarding the extent to which New Tech can rely on industry practice for its good-faith defense, what the oil industry practice actually is with respect to the classification of rig clerks, and the reliability of the advice of New Tech's counsel. And the Court is unpersuaded that even if the plaintiffs have not established evidence of willfulness, a finding that New Tech acted in good faith necessarily follows. Indeed, it is New Tech's burden to establish good faith "and it is generally more difficult to obtain summary judgment on an affirmative claim than to obtain it defending a claim." *Lipnicki*, 2014 WL 923525, at *12. "[I]t would not be logically inconsistent to conclude that an employer acted neither willfully nor in good faith." *Id.*; *see also Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008) ("Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present."). Accordingly, the Court denies without prejudice New Tech's motion for partial summary judgment with respect to liquidated damages.

### 5. Statute of Limitations

FLSA violations are ordinarily subject to a two-year statute of limitations. *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015); *see also* 29 U.S.C. § 255(a). The limitations period extends to three years for willful violations. § 255(a). To prove a willful FLSA violation, the plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)). "Willful" is synonymous with "voluntary," "deliberate," and "intentional." *McLaughlin*, 486 U.S. at 133. "[It] is generally understood to refer to conduct that is not merely negligent." *Id.* "Nor is [willfulness] a good faith but incorrect assumption that a pay plan complied with the FLSA." *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 924 (E.D. La. 2009). Thus, "[if] an employer acts unreasonably, but not recklessly, in determining its legal obligation," it has not acted willfully. *McLaughlin*, 486 U.S. at 135 n.13.

Unlike good faith, the plaintiff bears the burden of establishing that a purported violation was willful such that the FLSA's three-year statute of limitations applies. *Johnson*, 604 F. Supp. 2d at 924. While the failure to seek legal advice does not by itself show reckless disregard, "consulting with an attorney about the classifications may preclude a finding of willfulness." *Id.* Willfulness is a question of fact. *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016).

To show willfulness, the plaintiffs point to Cress's declaration and deposition testimony. Specifically, the plaintiffs argue that even though Cress testified that he sought the advice of counsel and believed that New Tech's classification of the plaintiffs was correct, he did not specifically investigate whether its classification complied with the FLSA. (Doc. 106 at 15). Critically, the plaintiffs failed to submit any evidence demonstrating willfulness in response to New Tech's motion and instead consolidate their statute-of-limitations argument with their good-

faith argument. But it is the *plaintiffs'* burden to submit competent evidence in support of a willfulness finding. They have not done so. The plaintiffs argue that New Tech's reliance on the advice of counsel, an IRS audit, and industry standards does not necessarily mean that New Tech specifically intended to comply with (or even considered) the requirements of the FLSA, and they may ultimately be correct. But merely negligent or unreasonable conduct is not sufficient to show reckless disregard. *See, e.g.*, *McLaughlin*, 486 U.S. at 135 n.13. And if *no* reliance on the advice of counsel does not by itself rise to the level of recklessness, then surely reliance on the incomplete or even erroneous advice of counsel would not. *See Johnson*, 604 F. Supp. 2d at 924

Moreover, the plaintiffs cite to no case law standing for the proposition that, as a matter of law, the statute of limitations cannot be decided before the issue of liability. Indeed, precedent from this circuit indicates the exact opposite. *See, e.g.*, *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 553 (5th Cir. 2009) (holding, before a liability finding, that the plaintiff's "allegations of willfulness cannot survive the summary judgment stage"); *Lipnicki*, 2014 WL 923524, at *9–12 (denying motion for summary judgment with respect to defendant's good-faith defense, but granting the motion with respect to willfulness). Accordingly, New Tech's motion for partial summary judgment (Doc. 89) with respect to the statute of limitations is granted, and the Court concludes that a two-year statute of limitations will apply in this case.[7]

## C.    New Tech's Motion for Decertification (Doc. 90)

After preliminary certification was granted in September 2016, New Tech now seeks to decertify the class of plaintiffs as not sufficiently similarly situated for FLSA purposes to proceed as a collective. (*See generally* Doc. 90-1). As they have maintained throughout this lawsuit and

---

[7] New Tech argued during oral argument, but not in briefing, that a two-year statute of limitations should result in the dismissal of Anderson's FLSA claim. Because this relief was not requested in New Tech's motion for partial summary judgment, the Court will not grant this request. (*See* Doc. 89 at 1–2). To the extent New Tech seeks to dismiss Anderson's claim, it must file a separate motion.

their motions practice, the plaintiffs contend that they are similarly situated and warrant class treatment. (*See generally* Doc. 104).

1.      **Relevant Facts**

Some of the plaintiffs formed their own independent business entities, and those who did structured their businesses in different manners.  Michael Clay and Larre Butler formed S corporations, (Docs. 90-3 & 90-4), while Shamsie and Harvey formed limited liability companies (Docs. 90-5 & 90-6).  Conversely, Anderson and Warren each chose to proceed individually without forming a separate legal entity. (Docs. 90-7 at 19 & 90-8 at 6).

The plaintiffs who formed their own companies managed those entities differently with respect to ownership and profit-sharing.  Clay and Butler owned their companies jointly with their spouses, (Docs. 90-3 at 35 & 90-4 at 83–84), while Shamsie owned 100 percent of his business himself, despite being married. (Doc. 90-5 at 7).  In 2015, Butler's company paid 47 percent of its revenues in officer compensation and wages to Butler and his wife, (Doc. 90-4 at 53–77), while Clay's company paid 34 percent of its revenues only in officer compensation and entirely to Clay, not his spouse. (Doc. 90-3 at 50–76).  The different methods of payments had different tax consequences.  Butler and Shamsie's decisions to directly pay themselves and their spouses required their businesses to pay employment taxes and complete IRS W-2 forms. (Docs. 90-4 & 90-5).  Clay, on the other hand, paid himself only in officer compensation. (Doc. 90-3).

The plaintiffs' revenues also varied.  Clay, Butler, and Shamsie's businesses earned gross revenues of $493,823 ($164,608 per year), $449,338 ($149,779 per year), and $488,371 ($162,790 per year), respectively, for the three-year period from 2013 to 2015. (Docs. 90-3, 90-4 & 90-5). Meanwhile, Harvey earned less than $100,000 in 2014 and 2015, and Warren earned roughly $65,000 in 2014. (Docs. 90-6 & 90-18).  With varying revenues and salary decisions, differences

existed in the amount each plaintiff invested in his business and the profit margins achieved as a result. For example, Clay, Butler, and Shamsie all made six-figure investments. Clay invested $161,592 in his business in 2014; Shamsie invested $146,620; and Butler invested $117,288 in 2013. (Docs. 90-3 at 28, 90-5 at 32 & 90-4 at 2). But Anderson invested just $15,313 for the years of 2013 and 2014 combined. (Doc. 90-16). Three plaintiffs' (Clay, Shamsie, and Butler) businesses invested substantial amounts (including nearly $200,000 in Clay's case) in property and other depreciable assets. (Docs. 90-3, 90-5 & 90-4). And some plaintiffs (Clay, Warren, Harvey, and Anderson) purchased their own safety equipment and supplies, (Docs. 90-11 at 26–27; Doc. 90-8 at 7; Doc. 90-14 at 12–14; Doc. 90-7 at 13–15), while others (Butler and Shamsie) testified that New Tech provided safety equipment. (Docs. 90-12 at 20–21 & 90-13 at 15).

The plaintiffs who owned their own businesses invested in those businesses in various ways. For example, Michael Clay Enterprises, Inc. invested in a retirement plan for its employees, (Doc. 90-3 at 28), and Clayton Paul Shamsie, LLC obtained a shareholder loan in the amount of nearly $24,000. (Doc. 90-5 at 124). Shamsie continued to invest in his business in 2016 after it stopped generating money, resulting in a loss of over $30,000 for that year. (*Id.* at 98).

In addition to employing different corporate forms (or none at all), the plaintiffs made different decisions with respect to which projects to pursue based on their own individual skills and experience. Clay engaged in commercial crawfish and rice-farming operations in addition to oilfield consulting. (Doc. 90-11 at 9–10 & 41). Butler operated a charter fishing business in addition to his oilfield work. (Doc. 90-12 at 26–27). Shamsie (through his company) and Anderson (individually), on the other hand, worked exclusively in the oil business and did not pursue other lines of work. (Docs. 90-5 at 2–3 & 90-7 at 20).

The plaintiffs made different decisions regarding what to do with their free time while working for an operator. Clay testified that he occasionally used his free time on the rig to manage his crawfish and rice-farming businesses. (Doc. 90-11 at 9–10 & 24–25). Anderson explained that during his free time on the rig, he played online poker and watched television. (Doc. 90-7 at 11–12). Warren testified that there was some time for personal activities but did not specify what he did during that time. (Doc. 90-8 at 11–13). Butler testified that he was permitted to take breaks whenever he wanted to, but that monitoring phones was his "primary duty" when not performing other tasks. (Doc. 90-12 at 22–23). And Butler's wife managed his charter fishing business while he was on a rig. (Doc. 90-12 at 26–27).

The plaintiffs found jobs in the oil industry in a variety of ways. The plaintiffs worked for different operators and on different rigs, both onshore and offshore.[8] Shamsie, Anderson, and Harvey found work independently through their own relationships with oil companies. (Doc. 90-13 at 16; Doc. 90-7 at 10; Doc. 90-14 at 7). Clay, on the other hand, sought work through New Tech when business was slow. (Doc. 90-11 at 46). Harvey and Warren never turned down a project proposed by New Tech (Docs. 90-14 at 15 & 90-8 at 12), while Butler testified that he could turn down work "if the pay wasn't up to par."[9] (Doc. 90-12 at 25). On one occasion, Clay turned down work when the rig's accommodations were unsatisfactory and found another job directly from the oil company itself. (Doc. 90-11 at 19–21). The plaintiffs also handled fees differently, as Clay and Warren typically accepted whatever fee was offered (Docs. 90-11 at 18 & 90-8 at 12), while Butler attempted to negotiate a higher rate "[a]ll the time." (Doc. 90-12 at 24–25). Finally, the plaintiffs each worked New Tech for varying lengths of time—from 15 years (Butler) to just six months

---

[8] Clay testified that he worked on both offshore and onshore rigs. (Doc. 90-11 at 5–6). Conversely, Warren worked only onshore (Doc. 90-8 at 13), and Harvey worked only offshore. (Doc. 90-14 at 3).
[9] Somewhat contradictorily, Butler replied "No, sir. I wasn't that bold," in response to being asked whether he ever stated that he would only go to a project for a certain rate. (Doc. 91-13 at 7).

(Warren). (Doc. 90-12 at 12; Doc. 90-11 at 3–4; Doc. 90-13 at 3; Doc. 90-7 at 4; Doc. 90-8 at 5; Doc. 90-14 at 3).

The plaintiffs also testified to some overall similarities in their day-to-day job duties. For example, Harvey explained that he "was responsible for sending the report in the mornings." (Doc. 104-7 at 6). Anderson testified he spent most of his time "[f]illing out reports" and "updating the costs," and that the "daily report was an ongoing process [he] worked on all day, every day." (Doc. 104-6 at 13). Shamsie stated that he would turn in reports based on "daily costs from different companies," which the "[c]ompany man would have to read, have to check over our costs, make sure everything was right and he would give you the okay to send out." (Doc. 104-5 at 5–6). Warren testified that he "kept up with costs" and "did daily reports." (Doc. 104-9 at 21). Clay explained that "the morning started with [the] drilling report, mak[ing] sure the drilling report was correct," which would be submitted to the "company man . . . so he could read it all up." (Doc. 104-3 at 19). Butler agreed that he was "[r]esponsible for daily drilling reports." (Doc. 104-4 at 12).

Additionally, New Tech employees testified to relatively uniform work requirements. Personnel Agent Paul Chavez explained that New Tech had no educational requirement. (Doc. 104-2 at 5). And Cress testified that rig clerks were hired based on their level of past experience. (Doc. 104-1 at 8).

## 2. Parties' Arguments

New Tech first argues that there is no Fifth Circuit case regarding decertification of a collective of independent contractors because the proof necessary to determine whether each plaintiff is properly classified cannot be applied to the class as a whole. (Doc. 90-1 at 16–20). Because the independent-contractor analysis necessarily includes an individualized inquiry for

each plaintiff, collective treatment is inappropriate. (*Id.* at 20). New Tech next applies the Fifth Circuit's five-factor economic realities test, demonstrating its belief that the test cannot be applied to each plaintiff using common evidence. (*Id.* at 20–26). New Tech asserts that there are differences between the plaintiffs in (1) degree of New Tech's control; (2) opportunities for profit or loss; (3) investments in their business; (4) skills and initiative; and (5) permanency. (*Id.*).

New Tech also argues that it may assert individualized defenses for each plaintiff, which is another justification for decertification. (Doc. 90-1 at 26–28). According to New Tech, there are defenses that it could assert against the plaintiffs individually, but not collectively, that would warrant decertification "even if independent contractor status could be determined collectively." (*Id.* at 28). Finally, New Tech urges that notions of fairness and judicial economy weigh in favor of decertification, asserting that the collective's small size alone warrants decertification and arguing that collective treatment would hinder its due process right to defend against each claim independently. (*Id.* at 28–29). New Tech concludes by asking the court to sever the original plaintiffs' claims in the event the class is decertified and the opt-in plaintiffs' claims are dismissed without prejudice. (*Id.* at 30–31).

In opposition to the motion, the plaintiffs first contend that the "infinitesimal differences" in their job duties do not change the fact that they are sufficiently similarly situated so as to warrant collective treatment. (Doc. 104 at 12). According to the plaintiffs, their job responsibilities were similar and included "track[ing] the comings and goings of either people or things to the rig." (*Id.* at 7). This requires the production of "a substantially similar 'daily report' tracking information from the previous day's activities." (*Id.*). The plaintiffs claim that New Tech is applying "too high a standard—essentially that all Plaintiffs much work under the exact same conditions and circumstances for the exact same hours each week," which, if true, would mean "no FLSA case

would ever survive decertification." (*Id.* at 12–13).  The plaintiffs then argue that New Tech's defenses are collective in nature—as it has argued in a previous motion for the Court to conclude that its decision-making with regard to all plaintiffs was made reasonably and in good faith. (*Id.* at 13–14).  According to the plaintiffs, it is New Tech's uniform classification decision itself that "failed to consider each employee's individual circumstances." (*Id.* at 14).

Finally, the plaintiffs counter New Tech's fairness and judicial economy arguments, asserting that "judicial efficiency, fairness, and procedural considerations weigh heavily in favor" of collective treatment. (Doc. 104 at 15).  The plaintiffs note the FLSA's dual purposes: (1) enabling plaintiffs to lower costs by pooling resources, and (2) benefiting the judicial system by resolving common issues of law and fact in one proceeding. (*Id.*).  According to the plaintiffs, "[c]lass and collective action cases much larger and more complex than this are tried routinely." (*Id.*).

### 3.    Discussion

As the Court has already discussed, the FLSA provides for collective actions by one or more employees against his employer "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  The Fifth Circuit has "never set a legal standard for collective-action certification." *Roussell v. Brinker Intern., Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995)).  However, "the majority of courts within the Fifth Circuit have adopted the *Lusardi* two-stage approach, after *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987)." *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 738 (W.D. Tex. 2018); *see also Johnson v. Big Lots Stores, Inc.*, Nos. 04-3201, 05-6627, 2007 WL 5200224, at *3 (E.D. La. Aug. 21, 2007) ("Since *Mooney* [*v. Aramco*

*Services Company*] district courts in the Fifth Circuit have uniformly used [the *Lusardi* analysis] to determine whether a collective should be certified under the FLSA.").

The first stage of the *Lusardi* analysis has already occurred—determining "whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class." *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010). If so, prospective class members are sent a notice permitting them to opt in to the lawsuit. *Id.* "As a court's decision at this first step is usually based only on the pleadings and affidavits, the standard is lenient and typically results in conditional certification." *Vanzzini v. Action Meat Distribs., Inc.*, 995 F. Supp. 2d 703, 720 (S.D. Tex. 2014). Now that "discovery is largely complete and more information on the case is available," the Court has reached the second *Lunardi* step—"a final determination of whether all plaintiffs are sufficiently similarly situated to proceed together in a single action." *Acevedo*, 600 F.3d at 519. At this stage, "[i]f the court determines the plaintiffs are similarly situated, the collective action proceeds." *Snively*, 314 F. Supp. 3d at 738–39 (citing *Vanzzini*, 995 F. Supp. 2d at 720). But if the Court concludes that the plaintiffs are not sufficiently similarly situated, "the opt-in plaintiffs are dismissed without prejudice to bringing their own actions, and the original plaintiffs may proceed with their individual claims." *Vanzzini*, 995 F. Supp. 2d at 720. "At this stage, courts are much less likely to allow the collective action to continue to trial." *Portillo v. Perm. Workers, L.L.C.*, 662 F. App'x 277, 281 (5th Cir. 2016).

"The decision whether to decertify a collective action is within a district court's discretion." *Vanzzini*, 995 F. Supp. 2d at 720 (citing *Mooney*, 54 F.3d at 1213). Though the plaintiffs must show they are similarly situated to warrant continued collective treatment, "courts are adamant that this does not mean . . . the plaintiffs are 'identically situated.'" *Id.* (quoting *Basco v. Wal-Mart*

*Stores, Inc.*, No. Civ.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004)). Rather, courts

generally consider the following three factors: "(1) the disparate factual and employment settings

of the individual plaintiffs; (2) the various defenses available to defendant which appear to be

individual to each plaintiff; and (3) fairness and procedural considerations." *Falcon v. Starbucks*

*Corp.*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008) (citing *Mooney*, 54 F.3d at 1213 n.7). The

factors are "not mutually exclusive, and there is considerable overlap among them." *Johnson v.*

*Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008). "The more dissimilar plaintiffs'

job experiences are from one another and the more individuated an employer's defenses are, the

less appropriate the matter is for collective treatment." *Id.* at 573. It is the plaintiffs' burden to

demonstrate that they are similarly situated. *Snively*, 314 F. Supp. 3d at 739 (citing *Proctor v.*

*Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2009)). The Court will address

each factor in turn, but cautions that it is making no findings or conclusions with respect to the

ultimate issue of whether each plaintiff was properly classified as an independent contractor under

the FLSA.

### a. Disparate Factual and Employment Settings

"The presence of a common policy, plan, or practice affecting all putative class members,

although not required, can be helpful in assessing the first factor, concerning the plaintiffs' factual

and employment settings." *Vanzzini*, 995 F. Supp. 2d at 721 (citing *Falcon*, 580 F. Supp. 2d at

535). Courts also look to "job duties, geographic location, supervision, and salary." *Snively*, 314

F. Supp. 3d at 739 (internal quotation marks omitted). "[I]t is clear that plaintiffs are similarly

situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or

of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien v. Ed*

*Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) (abrogated on unrelated grounds by

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016)).  In other words, collective treatment is warranted where there are "issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member." *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008).  Because it requires a fact-intensive inquiry that is "highly dependent on the particular situation presented," *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010), courts rarely grant final certification of a collective of plaintiffs alleging that they were improperly classified as independent contractors. *See, e.g.*, *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 295 (S.D. Tex. 2012) (denying conditional certification at the *notice* stage where "an individualized analysis would be required to determine whether each worker was an employee or an independent contractor").

New Tech and the plaintiffs generally agree that the plaintiffs are all affected by New Tech's policy of classifying rig clerks as independent contractors and not employees.  The parties strongly disagree, however, on how significantly each plaintiff's individual factual and employment settings diverge, which depends in large part on "the nature and purpose of the substantive law to be enforced." *Andel*, 280 F.R.D. at 294.  Here, the plaintiffs challenge their classification as independent contractors, arguing that they are instead "employees" within the meaning of the FLSA and should have been paid overtime.  To make this determination, a jury will be required (whether this case is tried independently or collectively) to determine "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).  "The determination of whether an individual is an employee or independent contractor is

*highly dependent on the particular situation presented.*" *Thibault*, 612 F.3d at 848 (emphasis

added).  Courts in the Fifth Circuit apply the following five non-exhaustive factors:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the
> relative investments of the worker and the alleged employer; (3) the degree to which
> the worker's opportunity for profit or loss is determined by the alleged employer;
> (4) the skill and initiative required in performing the job; and (5) the permanency
> of the relationship.  No single factor is determinative.  Rather, each factor is a tool
> used to gauge the *economic dependence* of the alleged employee, and each must be
> applied with this ultimate concept in mind.

*Id.* (citations omitted).

Importantly, though the opt-ins need not show that they are identically situated, "the

similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere

facts of job duties and pay provisions." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir.

2007) (internal quotation marks omitted).  Thus, even though all of the plaintiffs here are rig clerks,

have signed a consultant agreement with New Tech, and share similar job duties, the Court must

still conduct an "individualized analysis" to determine whether each plaintiff is an employee or

independent contractor for FLSA purposes.  The Court agrees with New Tech that there are clear

differences in the record between many of the plaintiffs' work situations.  While all of the plaintiffs

perform similar tasks (tracking costs, assessing needs, and managing supplies on onshore and

offshore oil rigs) and their circumstances with respect to supervision and method of salary are

relatively comparable, application of the economic realities test will necessarily require

individualized proof for each plaintiff and is not suitable for a collective action.

Indeed, there are significant differences in the plaintiffs' individual relationships with New

Tech—including how often they worked, whether or not they formed their own legal entity, and

how long their relationship with New Tech lasted.  Consequently, when a collective group of

plaintiffs challenges their classification as independent contractors, courts routinely deny

certification where the economic realities test will invariably require an individualized inquiry into the discrete facts of each plaintiff's work situation. *See Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003 n.182 (D. Kan. 2018) (gathering cases and finding that "[c]ourts typically deny collective certification" in employee/independent contractor classification cases "because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole"); *Pena v. Handy Wash, Inc.*, No. 14-20352, 2015 WL 11713032, at *11 (S.D. Fla. May 22, 2015) (concluding that "the procedural advantages of a collective action evaporate in this case based on the Plaintiffs' divergent factual circumstances"); *Carrera v. UPS Supply Chain Solutions, Inc.*, No. 10-60263, 2012 WL 12860750, at *9 (S.D. Fla. Sept. 14, 2012) (granting decertification where "to sustain their substantive misclassification claims and establish that the are employees pursuant to the 'economic reality test,' Plaintiffs will have to demonstrate fact-specific deviation from the terms of [the defendant's] agreements and policies"); *Andel*, 280 F.R.D. at 295–96 (concluding that conditional certification was not proper because there were "enough differences between each individual Plaintiff that the court would still be required to conduct an individualized analysis of each putative plaintiff").

For example, there are substantial factual differences in the record with regard to many of the economic realities test factors, including control, relative investments, opportunities for profit and loss, and permanency of the working relationship. While New Tech assigned the plaintiffs to specific jobs, Clay and Butler testified that they turned down jobs if they did not want them. Conversely, Harvey and Warren testified that they never turned down work from New Tech. *See Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *4 (S.D. Tex. Feb. 13, 2013) (observing that the ability to reject work assignments without consequence is relevant to the

control factor).  There were also differences between what the plaintiffs did with their time while on certain jobs.  Clay testified that he spent time managing his other businesses, while Anderson testified that he did not do any outside work and Butler's wife managed his fishing business while he was on a rig.  And though some plaintiffs never negotiated their own fee and simply accepted whatever New Tech proposed, Butler regularly negotiated his own rate.

With regard to relative investments and opportunities for profit and loss, the plaintiffs' deposition testimony differed significantly.  Clay, Harvey, Butler, and Shamsie all established their own independent businesses, while Anderson and Warren chose not to.  Of course, the mere fact that some plaintiffs had their own business entities while others did not may, by itself, be significantly relevant to this and other factors.  Plus, the plaintiffs' businesses produced varying levels of revenue, which resulted in different levels of investment in their businesses.  The plaintiffs' varying revenues, investments, and different decisions with respect to whether to establish independent business entities (and engage in outside work) could lead to disparate results regarding each plaintiff's level of economic dependence on New Tech. *See Hopkins*, 545 F.3d at 344 (examining whether the purported employer controlled the "major determinants" of the plaintiffs' opportunities for profit and loss); *Spellman v. Am. Eagle Exp., Inc.*, No. 10-1764, 2013 WL 1010444, at *4 (E.D. Pa. Mar. 14, 2013) (finding that the creation of independent business entities was the "kind of entrepreneurial conduct [that] strongly suggests an independent contractor relationship, while the absence of such activity is indicative of employment").  Similarly, the permanency factor will yield different results, as the range of time the plaintiffs performed work for New Tech spans from six months (Warren) to 15 years (Butler).

The Court's conclusion is in accord with analogous cases applying the economic realities test.  For example, in *Andel v. Patterson-UTI Drilling Company, LLC*, the court declined to

conditionally certify a class of plaintiffs at the first *Lusardi* stage despite the fact that the plaintiffs performed the same job and collectively challenged their status as independent contractors. Notably, at the significantly more lenient conditional-certification stage, the court concluded that there were "enough differences between each individual Plaintiff that" it would be required to perform an individualized analysis of each plaintiff's circumstances and, "[a]s such, certifying a class action under these facts would be inappropriate and, quite simply, would not promote judicial economy." *Andel*, 280 F.R.D. at 295–96.

Certifying a class of allegedly misclassified independent contractors at the second *Lusardi* stage is even rarer. For example, in *Carrera v. UPS Supply Chain Solutions, Inc.*, the plaintiffs, like the plaintiffs here, all signed the same contract classifying them as independent contractors. 2012 WL 12860750, at *1 (S.D. Fla. Sept. 14, 2012). To establish that they were misclassified and were actually employees under the FLSA, the plaintiffs would have to demonstrate "fact-specific deviation" from the terms of the agreements. *Id.* at *9. And the evidence for each plaintiff "varie[d] significantly." *Id.* Like the record before the Court here, the record in *Carrera* differed with respect to the control, investment, and permanency factors. *See id.* (showing disparities in levels of training, acceptance or denial of work assignments, free-time activities, personal vehicle usage, outside work, and the creation of independent business entities).

And in *Blair v. TransAm Trucking, Inc.*, the court decertified a collective of allegedly misclassified independent contractors because the "relevant facts that must be considered under the 'economic realities' test widely vary between [the plaintiffs], and thus the totality of the circumstances is unique to each plaintiff." *Blair*, 309 F. Supp. 3d at 1003 (internal quotation marks omitted). The court pointed to evidential disparities with respect to the control, opportunities for profit and loss, investments, and permanency factors. *Id.* at 1003–07. There, as here, it could not

"be said categorically that every [plaintiff] falls (or does not fall) under the auspices of the FLSA. Nor can it be said categorically that all [plaintiffs] are economically dependent on [the defendant] or that each [plaintiff] is in business for himself." *Id.* at 1009.

The common thread in all of these cases is that the application of the economic realities test will invariably require different proof—and could produce different outcomes—for each of the plaintiffs in the ultimate determination of whether each plaintiff was properly classified as an independent contractor under the FLSA. Thus, despite being jointly subject to an alleged misclassification and (in many cases) signing the same agreement, if the economic realities test requires different proof and is unlikely to produce the same result for each plaintiff in the collective, certification is not appropriate. *See, e.g.*, *Demauro v. Limo, Inc.*, No. 10-cv-413-T-33AEP, 2011 WL 9191, at *4 (M.D. Fla. Jan. 3, 2011) (the economic realities test's "necessarily individualized assessment eviscerates all notions of judicial economy that would otherwise be served by conditional class certification"); *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010) ("Evaluation of whether the [plaintiffs] are employees or independent contractors, based on the current record, would not be possible on a collective basis because it would require the Court to examine the [plaintiffs'] distinct relationships with [the defendant] and its various clients.").

b.     **Available Defenses**

With respect to the individual applicability of the employer's possible defenses, "courts are concerned with whether representative evidence can be used to make class-wide determinations and the extent to which resolution requires such individualized inquiries that the case cannot proceed collectively." *Vanzzini*, 995 F. Supp. 2d at 721 (internal quotation marks omitted). In other words, if "many different defenses will be raised with respect to each individual defendant,"

decertification may be proper. *Reyes v. Texas Ezpawn, L.P.*, No. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007) (citing *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000)). This is because the presentation of individualized defenses for each plaintiff would frustrate the efficiency of a collective action. *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) (citing *Aquilino v. Home Depot, U.S.A., Inc.*, No. 04-04100, 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011)).

Here, New Tech's assertion of individualized defenses buttresses the Court's decision to decertify. For example, if all plaintiffs were indeed misclassified as independent contractors, New Tech could defend some of their claims to overtime by arguing that they are overtime-exempt. New Tech may also argue that some of the plaintiffs are not entitled to the overtime they seek because it is based on time that is not compensable which, again, would require plaintiff-by-plaintiff analyses. Whether or not New Tech will argue that certain of its defenses apply to all of the plaintiffs is beside the point—the fact that an individualized inquiry will likely be necessary weighs strongly in favor of decertification. *See, e.g.*, *Zavala v. Wal-Mart Stores, Inc.*, No. 03-5309, 2010 WL 2652510, at *5 (D.N.J. June 25, 2010) (finding decertification appropriate where factual disparities would result in "defenses that will be individual to the various [plaintiffs]" and would preclude a "manageable collective action"). The Court concludes that here, the same factual disparities between the plaintiffs that could lead to different results under the economic realities test will also likely require the examination of individualized defenses, counteracting the efficiency of a collective action.

### c. Fairness and Procedural Considerations

With respect to fairness and procedural considerations, "courts must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of

resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Vanzzini*, 995 F. Supp. 2d at 721. The Court must be "mindful that the FLSA is a *remedial* statute, and should be construed broadly." *Id.* The Supreme Court has recognized that in permitting collective actions, Congress intended to provide "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

The Court is certainly mindful of the purpose of the FLSA and acknowledges the plaintiffs' arguments with respect to efficiency and the cost savings realized by proceeding collectively. However, the Court is also aware that the size of the collective here is exceedingly small compared to other FLSA collective actions. Indeed, "there is a vast difference between granting decertification regarding a potential class of hundreds, or even dozens, and thereafter facing as many individual suits, and granting decertification regarding" a class of single digits. *Vanzzini*, 995 F. Supp. 2d at 723. Despite the conservation of resources and judicial economy achieved by a collective action, "such benefits are only realized when the cases are *similarly situated*." *Id.* Here, based on the evidence in the record, the Court concludes that it would not be able to "efficiently resolve[] common issues of law and fact that arose from the same alleged activity." *Mahoney v. Farmers Ins. Exch.*, No. 09-cv-2327, 2011 WL 4458513, at *10 (S.D. Tex. Sept. 23, 2011).

### d. Severance

In addition to decertifying the prospective class, New Tech moves to sever the claims of the three original plaintiffs. (Doc. 90-1 at 30–31). New Tech argues that the standard for joinder under Federal Rule of Civil Procedure 20 is more stringent than the standard for certification under

the FLSA. (*Id.* at 31). Thus, if the Court grants decertification, it should also sever the named plaintiffs' claims "for the same reasons." (*Id.*).

Under Rule 21 of the Federal Rules of Civil Procedure, "the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Since Rule 21 does not itself provide a standard for severance, "courts have looked to Rule 20 for guidance." *Acevedo*, 600 F.3d at 521. Rule 20 permits "joinder of plaintiffs when (1) their claims arise out of the same transaction, occurrence, or series of transactions or occurrences and when (2) there is at least one common question of law or fact linking all claims." *Id.* (internal quotation marks omitted). "Generally, as long as both prongs of the test are met, permissive joinder of plaintiffs is at the option of the plaintiffs." *Id.* (internal quotation marks omitted). Nevertheless, even when the test is satisfied, courts have the discretion to deny joinder "in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness." *Id.* (citations omitted).

The Court notes that the Eleventh Circuit Court of Appeals has concluded that the FLSA's "similarly situated" standard is "more elastic and less stringent than the requirements found in Rule 20 (joinder)," such that a "unified policy, plan, or scheme" is not required. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996). But the Fifth Circuit has made no such pronouncement, and the Court grants decertification here because application of the economic realities test will require an individualized analysis, not because of the absence of a single policy applicable to all of the plaintiffs. Indeed, it is clear from the record that the plaintiffs signed a consultant agreement and are subject to New Tech's policy of classifying rig clerks as independent contractors. Rule 20's transaction and common-question requirements are "not rigid tests," and are instead "to be read as broadly as possible whenever doing so is likely to promote judicial economy." 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1653

(3d ed. 2018).  Wright and Miller define the "same transaction or occurrence" as "all logically related events entitling a person to institute a legal action against another." *Id.*  Accordingly, the Court finds that Rule 20's "same transaction or occurrence" and common question requirements are met here.

Moreover, the Court concludes that it would be in the interest of judicial economy and would avoid prejudice and delay to permit the named plaintiffs to proceed in one lawsuit.  And because there are only three named plaintiffs, it would not be fundamentally unfair (or inefficient) to try their claims jointly in the same lawsuit.  The Fifth Circuit's holding in *Acevedo* does not persuade the Court to pursue an alternative course.  There, the court concluded that the district court did not abuse its discretion by denying joinder of *800* plaintiffs where "it would not facilitate judicial economy and when different witnesses and documentary proof would be required for plaintiffs' claims." *Acevedo*, 600 F.3d at 522.  The same judicial economy concerns are not present here with just three named plaintiffs, even assuming an individualized economic realities analysis will be required for each.  In fact, the court in *Acevedo* noted that in *Allen v. Atlantic Richfield Company*, 724 F.2d 1131 (5th Cir. 1984), the Fifth Circuit permitted the Rule 20 joinder of 22 security guards' FLSA claims.  Accordingly, the Court concludes joinder of the three named plaintiffs' claims is proper, and New Tech's motion to sever is denied.

## D.      Plaintiffs' Motion for Summary Judgment (Doc. 91)

The plaintiffs move for summary judgment on the issues of employment status, backpay, and liquidated damages.  In many respects, the plaintiffs' motion for summary judgment constitutes additional briefing in opposition to New Tech's motions for partial summary judgment and for decertification.  Accordingly, the Court will not recite the facts relevant to the plaintiffs' motion.

### 1.     Parties' Arguments

The plaintiffs argue that the FLSA defines the term "employee" broadly and that all doubts should be resolved in favor of finding the existence of an employment relationship. (Doc. 91-1 at 9–10).  The plaintiffs then turn to the five factors of the economic realities test, asserting that the test "confirms" that they are New Tech employees. (*Id.* at 10–20).  With respect to degree of control, the plaintiffs claim that the consultant agreements they signed with New Tech dictated the manner in which they performed their work and limited them for working for other companies. (*Id.* at 11–12).  They also assert that New Tech supervised the plaintiffs' work, controlled their work schedules, and paid them before they were paid by the rig operator. (*Id.* at 13).  Next, the plaintiffs argue that "New Tech's investment in its workforce far surpasses the limited investment, if any, made by its workers." (*Id.* at 14).  They point to New Tech's investments in liability insurance, equipment, travel expenses, and office supplies as dwarfing any investments by the individual plaintiffs in their work. (*Id.* at 14–15).

On the third factor, the plaintiffs argue that New Tech determined their opportunities for profit and loss, and not their own independent activities. (Doc. 91-1 at 15–16).  Specifically, New Tech controlled the plaintiffs' rate of pay and prohibited the plaintiffs from turning down work. (*Id.* at 16).  The plaintiffs next argue that no special skill or "independent entrepreneurism" is required to perform their jobs, that there is no formal training requirement, and that their jobs are not particularly discretionary. (*Id.* at 17–18).  Finally, the plaintiffs argue that while the "permanence" factor may not apply to each plaintiff, "courts must make allowances for a business' operational characteristics that are unique or intrinsic to the particular business or industry and to the workers the business employs." (*Id.* at 19).  Moreover, because the plaintiffs worked for New Tech for an average of 16 months, "it cannot be [disputed] New Tech engaged Plaintiffs in long-

term employment." (*Id.*).  The remainder of the plaintiffs' brief is devoted to the issues of backpay and New Tech's good faith. (*Id.* at 20–26).

Unsurprisingly, New Tech disagrees with the plaintiffs' characterization of their relationship with New Tech.  New Tech first asserts that it did not control the plaintiffs' autonomy to turn down work, engage in outside work, and set their own schedules. (Doc. 103 at 3).  It argues that the provisions in its master services and consultant agreements to which the plaintiffs pointed do not show control, but rather are "safety and quality control measures" that are "irrelevant to employment status." (*Id.* at 4).  New Tech claims that its consultant agreements do not limit the plaintiffs' ability to market themselves. (*Id.*).  And New Tech directly contradicts the plaintiffs' assertion that they could not turn down work, claiming that the record demonstrates otherwise, and further that the plaintiffs "acted autonomously within broad parameters" while working on the rigs. (*Id.* at 5).

New Tech next argues that the plaintiffs' tax returns show "significant" investments in their own work and independent businesses. (Doc. 103 at 6).  It claims that comparing the plaintiffs' investments directly to New Tech's is misleading because the position of rig clerk "does not require heavy investments in fixtures or machinery." (*Id.*).  Relatedly, New Tech argues that the plaintiffs' opportunities for profit and loss should be viewed through the lens of economic dependence on the purported employer, as with every other factor. (*Id.* at 7).  Here, according to New Tech, the plaintiffs' "year-end profits were dependent on their costs, and whether they pursued other businesses . . . to generate additional revenue." (*Id.*).  Further, at least one plaintiff testified to negotiating his rate of pay and three "all turned down jobs without repercussion." (*Id.*).  Regarding the fourth factor, New Tech asserts that several of the plaintiffs demonstrated skills and initiative by "forming business entities and generating revenue from multiple sources." (*Id.* at 7–

8). New Tech also points out that three of the plaintiffs testified to finding work independently and simply "[running] the jobs through New Tech to take advantage of New Tech's group commercial liability insurance," which is "indicative of independent contractor status." (*Id.* at 8). Finally, New Tech argues that the permanency factor does not favor the plaintiffs because "permanency is not whether the worker stays for the entire project, but whether the work was project-to-project in the first place." (*Id.*).

## 2. Discussion

To this point, the Court has already granted New Tech's partial motion for summary judgment on the issue of willfulness and denied the motion with regard to New Tech's good-faith affirmative defense. *See supra* Section 2.C.iv–v. Accordingly, the Court denies as moot the portion of the plaintiffs' motion addressing New Tech's good faith defense. Further, the Court notes at the outset of this analysis that, though it has already concluded that application of the economic realities test in this case significantly impedes the efficiency of proceeding collectively, it will engage in a factor-by-factor analysis of the plaintiffs' motion to the extent practicable.

The Fair Labor Standards Act requires employers to pay employees 1.5 times more than their standard rate of pay for all hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). At issue here, of course, is whether the plaintiffs are "employees" within the meaning of the FLSA such that any hours that they may have worked in excess of 40 per week should be compensated. "The definition of employee under the FLSA is particularly broad." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). To determine whether a worker is an employee, the court focuses on whether, "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Id.* "The determination of whether an individual is an employee or independent contractor is highly

dependent on the particular situation presented." *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 848 (5th Cir. 2010). The Fifth Circuit has explained:

> To aid us in this inquiry, we consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. No single factor is determinative. Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind.

*Id.* (citations omitted). Applying these factors, the Court concludes that disputed material facts abound and the many facts in the record going in both directions preclude summary judgment for the plaintiffs.

### a.     Degree of Control

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987). This means that "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* The "meaningful" parts of a business include "hiring, firing, assignment, and promotion." *Hopkins*, 545 F.3d at 343. The control inquiry is focused on whether the purported employer exercises control over the "manner or method" of the plaintiffs' work. *See, e.g.*, *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332–33 (5th Cir. 1993) (finding no control where the defendant's "customers dictated the specific" procedures and equipment required for each project).

The plaintiffs assert that New Tech had "total contractual control" over the plaintiffs through its master services agreements ("MSAs") and consultant agreements. The plaintiffs argue that New Tech's MSAs (agreements between New Tech and the operators) control the manner or method of their work only by citing to the MSA itself. (*See* Doc. 91-1 at 11–12). They maintain

that the consultant agreements demonstrate control over their work by requiring them to maintain "the highest ethical standards" and "perform the services in a good and workmanlike manner." (*E.g.*, Doc. 91-4 at 2). The agreements also state that the plaintiffs will provide services "in a manner consistent with the appropriate safety, health, and environmental considerations." (*Id.*). The plaintiffs also point out that the agreements included confidentiality provisions and that the "onboarding process included drug testing as a prerequisite." (Doc. 91-1 at 12). Finally, they assert that the agreements prevented the plaintiffs from working for other companies and prohibited them from marketing themselves. (*Id.*).

Unfortunately for the plaintiffs, most of these arguments are not indicative of New Tech's direct control over their work. First of all, courts routinely hold that quality control and safety standards do not demonstrate the level of control over the manner and method of work necessary to support employee status. *See Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *6 (S.D. Tex. Feb. 13, 2013) (finding control factor favored independent-contractor status where requirements were "either required by the Occupational Safety & Health Administration or Texas Private Security Bureau rules and regulations, or are quality control and/or safety provisions that are mandated by the oil and gas companies or landowner—not [the defendant]"); *Jacobson v. Comcast*, 740 F. Supp. 2d 683, 691 (D. Md. 2010) (defendant's quality control procedures were not indicative of employment where they "stem[med] from the nature of their business and the need to provide reliable service to their customers"); *FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 501 (D.C. Cir. 2009) ("We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship."); *Moreau v. Air France*, 356 F.2d 942, 951 (9th Cir. 2004) (observing that "indirect supervision or control" exercised by the purported employer did not demonstrate direct control where it was mean "to ensure

compliance with various safety and security regulations"). The Court concludes that the drug-testing requirement similarly falls within this ambit and cannot be used to show control over the manner or method of the plaintiffs' work as rig clerks. In fact, the agreement's drug-testing provision provides for testing by either New Tech or the customer. (*See, e.g.*, Doc. 91-4 at 4).

Courts have found that alleged employers providing instructions to workers does not necessarily indicate control over the manner or method of work. Indeed, in *Thibault v. Bellsouth Telecommunications, Inc.*, the defendant "told" the plaintiff what needed to be done and gave him "blueprints." *Thibault*, 612 F.3d at 847. And, crucially, the defendant would assign jobs to the plaintiff. *Id.* Here, New Tech established general parameters regarding safety and quality control in its consultant agreements and assigned work to each of the plaintiffs. In fact, the guidance provided by New Tech appears less specific and controlling regarding the method or manner of the plaintiffs' work than that provided by the defendant in *Thibault*.

Moreover, New Tech disputes the extent to which the consultant agreement's confidentiality and exclusivity provisions demonstrate control. Here, New Tech is correct to point out that the confidentiality provision of the agreements before the Court does not preclude the plaintiffs from working for other companies. (*See, e.g.*, Doc. 91-4 at 4 ("Consultant shall honor the duty to maintain confidentiality about Service Provider and Company information and processes."); *see also Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (finding independent-contractor status where there was "nothing in the confidentiality agreement that would have precluded [the plaintiff] from working for other insurance companies"). Further, the agreement's plain language does not prohibit signees from marketing themselves or working for other companies, except that it prevents an individual from working for a customer after terminating his relationship with New Tech "prior to the conclusion of the specific job or project."

(*See, e.g.*, Doc. 91-5 at 2–3). Indeed, the agreement's appointment of New Tech as "marketing agent" did not prevent Shamsie, Anderson, and Harvey from finding work directly from the customers themselves. And while the agreement's declaration that the "[c]onsultant is an independent contractor" is not dispositive of independent-contractor status in and of itself, it is relevant to the inquiry. *Carrell*, 998 F.2d at 334 n.4.

The plaintiffs also assert that New Tech supervises their work, but their depositions do not support this contention. Harvey, Shamsie, and Clay all testified in their depositions to some degree of communication with New Tech. But this testimony did not demonstrate that New Tech was directly controlling the manner or method of their work. Instead, New Tech would check on the plaintiffs to see "[h]ow work was going" and "if [the plaintiffs] were working," because New Tech "didn't know if we were working or not." (Doc. 91-14 at 4). The phone calls did not include such topics as "lining up logistics for equipment," or "lining up supplies for the rig." (*Id.*). In fact, Shamsie testified that he was "told by the company man[10] whether to order anything." (*Id.*). Shamsie also testified that he was trained by the "company man" and that the "company man told me how he wanted it done." (*Id.*). New Tech "couldn't tell me where I was at or what I was doing or what was going on at any period of time." (Doc. 103-4 at 11). Similarly, Harvey testified "[w]hatever the company man on the job asked us to do, we did. I didn't do anything without

---

[10] The plaintiffs refer repeatedly in their depositions to the "company man." While this term is never clearly defined by any of the parties, it appears to the Court from this and other exchanges that "company man" refers to an employee of the rig operator, not New Tech. (*See* Doc. 91-14 at 4 (explaining that two particular "company men" worked for "ENI Petroleum"); Doc. 103-5 at 14–15 (same)). Tellingly, the plaintiffs do not assert in briefing that the "company man" is a New Tech employee. Instead, they argue that the fact that certain plaintiffs testified that they receive instructions from a company man demonstrates that their "jobs did not include the type of discretion that a consultant typically provides," under the individual skills and initiative factor of the economic realities test. (Doc. 91-1 at 18). New Tech responds that "[t]o the extent any 'orders' from a company man were given to any plaintiff, such evidence is immaterial because *it does not show control by New Tech*, since there is no evidence that the company men were acting at New Tech's behest." (Doc. 103-1 at 24). However, Clay testified that he believed the "company man" may have been a New Tech employee approximately "60 percent of the time, maybe." (Doc. 103-5 at 9). Cress testified that rig clerks are neither supervised nor subject to discipline by New Tech employees, and that New Tech has "extremely limited contact with the clerks while they are on location." (Doc. 103-14 at 2).

being told what to do." (Doc. 104-7 at 6). When asked "[w]ho, if anyone, would tell you how to perform your duties?" Anderson replied, "[c]ompany man." (Doc. 91-15 at 4).

Harvey testified that New Tech would call to discuss his pay rate, in one case informing him that the customer "wanted to pay [New Tech] less to pay us less." (Doc. 91-16 at 4). Over the course of 18 to 19 months on a rig, he spent "two to three hours total" speaking to New Tech on the phone and communicated occasionally by email, but not in person. (*Id.*). Typically, these communications consisted of New Tech "drop[ping] an email to check to see how we were doing." (*Id.*). He testified that New Tech did not provide him with any manual or policies or procedures other than for invoicing purposes. (*Id.* at 4–5). Warren stated that if he were to be disciplined on a rig, it would be by the "company man" because "[h]e has control over the . . . well site." (Doc. 104-9 at 22). Butler testified that "the company man would tell me 'call this guy, call this guy, cancel this guy, order this,' you know." (Doc. 104-4 at 22).

Even accepting the plaintiffs' contentions that New Tech communicated with them and occasionally provided training support for new workers (through other, more experienced rig clerks), it is clear that there is a significant amount of countervailing evidence in the record that precludes a finding, at this stage of the litigation, that New Tech directly controlled the method and manner of each plaintiff's work. And while New Tech may have assigned work to the plaintiffs, this is insufficient by itself to demonstrate substantial control over the method or manner of their work.

### b. Relative Investments

In the application of the relative-investments factor, the Court must "compare each worker's *individual* investment to that of the alleged employer." *Hopkins*, 545 F.3d at 344. Thus, the Court compares "the amount the alleged employer and employee each contribute to the specific

job the employee undertakes." *Thibault*, 612 F.3d at 847. Where the plaintiff's investment in the task at hand is substantial in relation to the purported employer, the relative-investments factor weighs in favor of independent contractor status. *See id.* at 847–48 (finding independent contractor status where the plaintiff provided his own supplies, lodging, and meals, and the defendant provided a temporary base of operations and some supplies).

Here, *Carrell* is instructive and problematic for the plaintiffs. The *Carrell* plaintiffs supplied their own vehicles and equipment, and "provided their own lodging and own meals." *Carrell*, 998 F.2d at 333. The purported employer provided liability and worker's compensation insurance, as well as some additional equipment. *Id.* Similarly, in the case at hand, New Tech has pointed to record evidence demonstrating that at least some of the plaintiffs relied on their own equipment, including vehicles, computers, and safety gear, while New Tech provided certain safety supplies. (*See* Doc. 91-14 at 6 (New Tech provided shirts, a hard hat, and "[m]aybe some safety glasses," but not coveralls, boots, gloves, earplugs, or any electronics or vehicles); Doc. 91-15 at 3 (New Tech provided a hat, but not "any gloves, boots, coveralls, safety glasses, ear plugs, or a hard hat")). The plaintiffs note that New Tech provided general liability insurance and, in at least some instances, reimbursed travel expenses and for the use of personal equipment——which is all relevant to the relative-investments inquiry. (*See* Doc. 91-10 at 4 (Cress testifying that "all of [New Tech's] contractors . . . are covered under [New Tech's] general liability policy"); (Doc. 91-16 at 5 (Harvey explaining that New Tech reimbursed him for travel expenses); (Doc. 91-6 (New Tech's documentation of Butler's reimbursable travel expenses); (Doc. 103-5 at 27–30 (Clay testifying to an invoice he submitted to New Tech claiming expenses for travel and supplies[11]).

---

[11] Both Clay and counsel refer to the "company" in this exchange. (*See* Doc. 103-5 at 29 ("Q: So would that typically be the expenses you would have reimbursed by the company, just the mileage and the hotel cost? A: Correct. Or any office supplies we may have bought, which was not often.") & 29–30 ("Q: Anything else they would reimburse you for? You didn't need a computer, right, so they didn't reimburse you for a computer, right? A: When I did a Tanner

40

New Tech, however, maintains that "[i]n most instances, New Tech does not reimburse the rig clerks for any mileage or lodging expenses incurred because, as independent contractors, they are responsible for their own expenses." (Doc. 103-14 at 2). Thus, the Court concludes based on the record before it that the relative-investments factor does not clearly weigh in the plaintiffs' favor.

### c. Worker's Opportunity for Profit or Loss

The third factor of the economic realities test focuses on "whether the worker or the alleged employer controlled the major determinants of the amount of profit which the worker could make." *Hopkins*, 545 F.3d at 344 (internal quotation marks omitted). A worker's ability to market himself and choose the days and times he can work have been found to be indicative of independent-contractor status. *See Eberline v. Media Net., L.L.C.*, 636 F. App'x 225, 228 (5th Cir. 2016) (finding the profit/loss factor weighed in favor of independent-contractor status where the plaintiffs could, among other things, "determine the days and times that they were available to work" and market themselves by performing additional custom work for the third-party companies with which the alleged employer contracted). Conversely, where the employer defendant controls and can wield influence over the factors underlying the plaintiffs' "primary source of income" and determines whether they can own and operate other businesses, this factor favors employment. *Hopkins*, 545 F.3d at 344–45.

Based on the evidence in the record, it appears that, on balance, New Tech wielded significant influence and control over the major determinants of the plaintiffs' profits. This is not to say that the plaintiffs had no opportunity to earn profits independent of their relationship with New Tech, however. Indeed, several of the plaintiffs operated their own independent business

---

job shore based, I think I got a computer fee."). While it appears to the Court that "company" refers to New Tech based on the context of the exchange, "company" often refers to the operator in other contexts. No party offers any clarification on this point.

entities which engaged in revenue-producing work outside of the oil industry. But many of the plaintiffs performed work only through New Tech and were reliant on New Tech to find and assign jobs to them. Indeed, Harvey testified that when New Tech told him that a customer wanted to pay less, "there wasn't a whole lot I could do. I wasn't adamant that they keep it the same. I would have taken slightly less had they kept us out there." (Doc. 91-16 at 4). The plaintiffs also dispute the extent to which several of the plaintiffs' outside revenue-generating activities were as significant as New Tech claims. At the very least, there is considerable evidence trending in both directions and to the extent this factor favors employee status, it does not do so overwhelmingly.

### d.    Skill and Initiative

Fourth, the Court must consider "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status." *Hopkins*, 545 F.3d at 345. Courts examine whether the workers have "some unique skill set, or some ability to exercise significant initiative within the business." *Id.* (citations omitted). Skills that are not specialized and are instead common to all successful employees are not considered. *See id.* (concluding that general managerial skills are "not specialized skills; they are abilities common to *all* effective managers"); *see also Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1314 (5th Cir. 1976) (skills "such as business sense, salesmanship, personality, and efficiency" do not qualify as the types of skills indicative of independent-contractor status). "Routine work which requires industry and efficiency is not indicative of independence or nonemployee status." *Usery*, 527 F.2d at 1314.

Once again, there is evidence in the record regarding the plaintiffs' skill and initiative that could suggest both employee and independent-contractor status. Based on the job description and requirements, it appears that New Tech's characterization of the plaintiffs as "experts" in their field is somewhat misleading. While the plaintiffs' work may be skilled, the facts highlighted by

New Tech are closer to general skills like business sense, salesmanship, and efficiency than to a "unique skill set" or an ability to exercise "significant initiative within" the oilfield business. At the same time, there is evidence that at least some of the plaintiffs sought work from other companies in the industry on their own, without the assistance of New Tech. Accordingly, the Court concludes that the skills and initiative factor is disputed, if not trending slightly toward employee status.

### e. Permanency

The fifth and final factor is the permanency of the work relationship. *Hopkins*, 545 F.3d at 345. The permanency factor includes whether the relationship is indefinite and whether it can be terminated easily by either the worker or the alleged employer. *See id.*; *Eberline*, 636 F. App'x at 229 (finding permanency factor favored independent-contractor status where the term of the relationship was indefinite). Further, "courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ." *Brock*, 814 F.2d at 1054. Finally, courts consider whether a person works exclusively for the defendant or earns money in other ways. *See Thibault*, 612 F.3d at 846 (finding this factor weighing toward independent-contractor status where the plaintiff worked temporarily for the defendant and had his own separate business); *see also Carrell*, 998 F.2d at 334 (concluding plaintiffs were independent contractors where their relationship with the defendant was "on a project-by-project basis").

The record demonstrates a significant variation in the amount of time each plaintiff worked for New Tech, from just six months (Warren) to 15 years (Butler). The consultant agreement "may be terminated without cause at any time by either party," upon the furnishing of 30 days' written notice. (*E.g.*, Doc. 91-4 at 2). And the plaintiffs' relationship with New Tech was generally both

project-by-project and nonexclusive. Accordingly, contrary to the plaintiffs' arguments, this factor actually weighs in favor of independent-contractor status.

After application of the economic realities test, it is apparent that the record is full of disputed material facts and the Court could not enter summary judgment in favor of even one plaintiff, let alone all of them on a collective basis. Indeed, no factor clearly suggests either employment or independent-contractor status with respect to all of the plaintiffs, and the outcome of the test is uncertain based on the record currently before the Court. Accordingly, the plaintiffs' motion for summary judgment (Doc. 91) is denied.

### III. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** as follows:

(1) New Tech's Motion to Sever Claims by Plaintiff Gene Holbrook (Doc. 71) is **GRANTED**, and Holbrook's claims are **DISMISSED WITHOUT PREJUDICE**;

(2) New Tech's Motion for Partial Summary Judgment (Doc. 89) is **GRANTED IN PART** and **DENIED IN PART**;

(3) New Tech's Motion for Decertification (Doc. 90) is **GRANTED IN PART** and **DENIED IN PART**, and the claims of opt-in Plaintiffs Joshua William Warren, Joseph LaVelle Anderson, and John Robertson Harvey are **DISMISSED WITHOUT PREJUDICE**;

(4) New Tech's Motion for Summary Judgment as to Plaintiff Gene Holbrook (Doc. 94) is **DENIED AS MOOT**; and

(5) Plaintiffs' Motion for Summary Judgment (Doc. 91) is **DENIED**.

Signed in Baton Rouge, Louisiana, on March 4, 2019.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**